UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

David McGee,

   Plaintiff,

  v.           Civil Action No. 1:10-CV-11

Andrew Pallito, Robert Hofmann,
Kurt Kuehl, Robert McDougall,
Marie Salem, Robert Kupec, Kevin
Oddy, Phil Fitzpatrick, Brian Reed,
Cindy Modiano, Mary Ellen Cross,
Richard Byrne, David Talcott, Greg
Hale, Tim Harrington, Philip Brochu,
Phillip Quijano, Joseph Sylvestri,
Marshall Rich, David Martinson,
Michael Bellizzi, Scott Morley,
Anita Carbonell, Ellen McWard,
Dominic Domato, Mark Potanas,
Christina Granger, James Kamel,
Joshua Rutherford, Michael Arace,
James Edwards, Monique Sullivan,
Correctional Officer Simmons,
Correctional Officer Camp, Delores
Burroughs-Biron, M.D., Nurse
Manager Doe, Nurse(s) Doe, and
Prison Health Service, Inc.,

   Defendants.

## REPORT AND RECOMMENDATION
(Docs. 58, 62, 79 and 82)

  Plaintiff David McGee, a Vermont inmate proceeding *pro se*, claims that his

constitutional rights have been violated in several respects during the course of his

incarceration.  Specifically, his 116-page Complaint alleges denial of basic sanitation;

retaliatory transfers; denial of adequate clothing and shelter; denial of prescription medications; retaliatory destruction of legal materials; and systematic deprivations of personal property. Defendants have moved to dismiss the Complaint, arguing that McGee fails to allege facts that rise to the level of unconstitutional conduct, and that with respect to certain Defendants, he has failed to establish sufficient personal involvement in the alleged wrongdoing. In addition, the State of Vermont Defendants contend that they are entitled to qualified immunity and sovereign immunity.

For the reason set forth below, I recommend that the motions to dismiss be GRANTED in part and DENIED in part.

## Factual Background

McGee is a self-described "experienced inmate litigator who believes in using the law and court system to hold prison officials accountable for their past misconduct and to discourage them from future abuses." (Doc. 71 at 1.) In the instant case, he brings thirteen separate causes of action. The Court will not recount all of the factual allegations set forth in his 846-paragraph Complaint, but will instead summarize his claims. For the limited purpose of ruling on the pending motions to dismiss, the facts alleged in the Complaint are accepted as true.

In Count 1, McGee claims that for a period of time while incarcerated at Vermont's Northwest State Correctional Facility ("NWSCF"), he was barred from using the restroom more than once every two hours during the night. On at least one occasion, he was denied immediate access to a restroom and had to urinate into his coffee mug. He was subsequently informed that he suffered from an enlarged prostate that could cause

him to urinate frequently.  McGee now claims that the "two-hour rule" violated his constitutional rights.

Count 2 alleges a retaliatory transfer.  As part of civil litigation initiated by McGee in state court, Assistant Attorneys General Kurt Kuehl and Robert McDougall noticed his deposition.  Because the deposition was scheduled to be taken at a facility in South Burlington, and McGee was being housed out of state, a prison transfer was required.  McGee claims that during his time at the out-of-state facility, he "had acquired a great deal of personal property not allowed in Vermont prisons, had a prison job, and lived in an 'honor dorm.'"  (Doc. 7 at ¶ 134.)  He therefore filed an objection to the deposition notice under Vermont Rule of Civil Procedure 30(a), which provides that inmate depositions "may be taken only by leave of a Superior Court judge on such terms as the judge prescribes," and proposed that the deposition be conducted via telephone.  Before the state court could rule on his objection, however, he was transferred to Vermont.

As a result of his transfer, McGee was allegedly deprived of his legal materials.  He also claims that once in Vermont, he was subjected to further transfers within only a few days and "under harsh conditions."  (*Id.* at ¶ 183.)  His legal claim is that "[t]he temporal proximity between Plaintiff's legal activities and his transfer from Kentucky to Vermont for a deposition that was not authorized by the superior court . . . establishes a direct causal connection between Plaintiff's protected activity and the adverse actions taken against Plaintiff by Defendants."  (*Id.* at ¶ 184.)

Count 3 alleges that McGee was denied seasonally-appropriate clothing for a period of time.  He claims that without proper clothing, he was exposed to sub-freezing

temperatures when accessing the cafeteria and other prison buildings, could not participate in outdoor recreation, and became ill.  Count 3 also claims that while he was incarcerated at the Chittenden Regional Correctional Facility ("CRCF"), Department of Corrections ("DOC") officials would not allow him to keep the string that held up his sweatpants.

Count 4 claims that during a 24-hour "lockdown drill," water to all cells was turned off for approximately 20 hours.  Inmates were provided one eight ounce cup of milk with breakfast, and eight ounce cups of Kool-Aid with lunch and dinner.  McGee was also provided a four ounce cup of water in the mid-afternoon.  He now claims that due to an intestinal condition, he became constipated and later suffered painful bowel movements.  He also alleges that without flushable toilets, toilets in the cells and the common bathrooms emitted noxious odors that made him sick, and that "exposed raw human excrement constituted a biohazard."  (*Id.* at ¶ 267.)

Count 5 is another retaliatory transfer claim, again arising out of civil litigation initiated by McGee in state court.  Jury selection was scheduled, but was "effectively canceled" after the parties submitted summary judgment motions.  (*Id.* at ¶ 313.)  McGee alleges that, notwithstanding the cancellation, AAG Kuehl requested the DOC's out of state unit to transfer McGee back to Vermont for jury selection.  The transfer itself caused McGee great physical discomfort.  Once he arrived in Vermont, he was allegedly deprived of adequate bedding and clothing, lost some of his personal property, had fewer privileges than those he had been enjoying while incarcerated out of state, and when he

inquired as to the reason for the transfer, was allegedly told that the DOC was "just yanking [his] chain."  (*Id.* at ¶ 349.)

Count 6 alleges a third retaliatory transfer.  In this instance, McGee claims that he was transferred from CRCF to Southern State Correctional Facility ("SSCF") in retaliation for filing a series of grievances.  At SSCF, he was forced to sleep on the floor due to overcrowding.  Overcrowding also required him to spend part of his time at SSCF in segregation.  While in segregation, McGee was allegedly denied all personal property, was allowed out of his cell one hour per day, and could not go outside.

In Count 7, McGee asserts that he was denied adequate shelter, and that the conditions at SSCF constituted cruel and unusual punishment.  Part of his time at SSCF was spent in a small intake unit known as the "fishtank."  McGee claims that inmates in the fishtank were forced to sleep on dirty mattresses on the floor, with only a thin cotton blanket and no sheets.  With six or seven inmates in the fishtank at one time, the mattresses abutted each other, and inmate blankets often touched other mattresses or the floor.  There was one toilet and one sink, access to hygiene items (toothbrush, soap, etc.) only once per day, and no other property allowed.  Because of prison overcrowding, the fishtank was used as a regular living unit.  McGee claims that he spent four days in the fishtank.

Count 7 further alleges that McGee was placed in a "punitive/administrative segregation unit" due to overcrowding.  When he returned to general population, he had to sleep on the floor because of a lack of available bunks.  He claims that his mattress

was on the floor, and that the mattress and linens were "frequently covered with ants, as the ground floor cells were regularly infested." (*Id.* at ¶ 397.)

Count 8 claims that while confined in the fishtank, McGee and other inmates had to use a toilet that could be viewed by female correctional officers. Although there was a private inmate restroom in the building unit, some, though not all, correctional officers barred fishtank inmates from using it. McGee asserts that this conduct by DOC employees denied him his limited right to bodily privacy.

Count 9 alleges that for a period of seven days, McGee was denied a "normal" toothbrush, and was instead provided a "small, plastic, 'thimble-like' tool." (*Id.* at ¶¶ 418-19). McGee claims that the tool was not effective for cleaning teeth, was unsanitary because it forced him to put his fingers inside his mouth, and caused him pain. He states that he was given the tool while in a disciplinary segregation cell, but that he had been placed in the cell due to prison overcrowding, and not because of any disciplinary issues.

Count 10, which alleged denial of access to legal materials, has been dismissed by the parties with prejudice. (Doc. 68.)

Count 11 claims a systematic denial of medications in violation of the Eighth Amendment. McGee alleges that he suffers from a variety of medical conditions, including: environmental allergies; back and knee pain; intestinal pain and bleeding; and migraine headaches; as well as depression, bipolar, and anxiety disorders. He claims that he was prescribed numerous medications for these conditions, and that several were allowed to expire or were "wrongfully discontinued" on three separate occasions, "causing Plaintiff to go without the medications for, at times, over a week." (Doc. 7 at ¶

489.)  He contends that medications were discontinued by non-prescribers (*e.g.* "SSCF Nurse Doe"), and that one such non-prescriber was doing so without the prescribers' permission in order "to save money."  (*Id.* at ¶ 496.)  McGee also claims that there was a policy of discontinuing medications when inmates missed doses, but that some of his medications were to be taken only on an "as needed" basis, and should not have been discontinued.  (*Id.* at ¶¶ 494, 502.)

Count 12 claims that in the course of a transfer from SSCF back to Kentucky, several of McGee's legal documents were intentionally mishandled and/or destroyed. The documents allegedly pertained to grievances and a lawsuit McGee had brought against SSCF for mishandling his personal property.  McGee contends that "[t]he temporal proximity of Plaintiff's grievances and property claims against SSCF staff to the actual destruction of his property and legal materials . . . infers a direct causal connection" between the alleged destruction and "Plaintiff's protected conduct of filing grievances and lawsuits."  (*Id.* at ¶¶ 566-67.)

Count 13, which alone consists of 195 paragraphs of facts, claims that McGee was systematically denied his personal property without due process.  McGee summarizes his claim as follows, alleging that various DOC officials and employees should be held liable for:

> (1) allowing any staff unfettered discretion in taking inmate personal property; (2) failing to provide inmates with receipts or notice when taking possession of or confiscating inmates' property; (3) using incorrect lists of allowed property when transferring inmates between correctional facilities; (4) sending inmate personal property to third-parties without the inmate-owner's authorization; (5) failing to hold due process hearings after confiscating inmate property and before permanently dispossessing the

7

inmate-owner of the property; (6) failing to inform the inmate-owner of, and failing to document, the "final disposition" of inmate property before destroying or disposing of it; (7) unreasonably delaying inmates' receipt of their personal property during transfers between correctional facilities; (8) unreasonably withholding and delaying the transfer of inmates' allowable personal property without legitimate penological justification; (9) dispossessing those inmates who are temporarily returned to Vermont from [out-of-state] facilities for legal proceedings of their [out-of-state] allowable property; and (10) general and widespread mishandling of and disregard for inmate personal property that results in manifestly predictable losses, withholding, and damage.

(*Id.* at ¶ 764.)

The Complaint seeks injunctive relief on some claims, and declaratory and monetary relief on all claims. McGee asserts federal constitutional claims, pursuant to 42 U.S.C. § 1983, as well as state law claims over which he asks the Court to assert supplemental jurisdiction under 28 U.S.C. § 1367.

Defendants are past or present employees of the State of Vermont, with the exception of Prison Health Services, Inc. ("PHS") and two Nurse Does. The State Defendants, except for Correctional Officer Simmons (who has not been served), have moved to dismiss all claims. (Doc. 59.) PHS asserts that it is only named in Count 11, and therefore moves to dismiss that Count, incorporating into its motion the arguments set forth by the State Defendants. The motions are submitted pursuant to Fed. R. Civ. P. 12(b)(6).

## **Discussion**

### I.     **Motion to Dismiss Standard**

In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the Complaint as true and draw all reasonable

inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521

(2d Cir. 2006); *Nechlis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).

Furthermore, pleadings drafted by a *pro se* party should be liberally construed. *See*

*Fernandez v. Chertoff*, 471 F.3d 45, 51 (2d Cir. 2006). "In order to survive a motion to

dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to

raise a right of relief above the speculative level.'" *Operating Local 649 Annuity Trust*

*Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, McGee must allege "enough facts

to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct

1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).

## II.      Conditions of Confinement Claims (Counts 1, 3, 4, 7 and 9)

Defendants first challenge McGee's conditions of confinement claims. Those

claims are brought under the Eighth Amendment. The Eighth Amendment prohibits

cruel and unusual punishment that involves the unnecessary and wanton infliction of

pain. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Relevant to McGee's conditions of

confinement claims, the Eighth Amendment imposes a duty on prison officials to provide

humane conditions, and to ensure that inmates receive adequate food, clothing, shelter

and medical care. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

In order to prevail on an Eighth Amendment claim, a plaintiff must satisfy both an

objective and subjective component. First, the deprivation must be, from an objective

perspective, sufficiently serious, such that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Id.* at 834 (citing *Rhodes*, 452 U.S. at 347); *see also Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citation omitted) (minimal civilized necessities include "basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety.").  The second component requires that the prison official have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834.  In cases such as this, that state of mind is one of deliberate indifference to the health and safety of an inmate.  *Id.*

### A.    "Two Hour Rule" (Count 1)

In Count 1, McGee claims that Correctional Officers imposed a "two hour rule," meaning that inmates could not use the restroom more than once every two hours between 10 p.m. and 6 a.m.  As a result, McGee once had to urinate in his coffee cup.  He also claims that he was denied drinking water between these hours, and that when allowed to use the restroom, he was not allowed to wash his hand with soap.  Defendants contend that these allegations "fall so far short of the mark as to be *de minimis*."  (Doc. 59 at 14.)

Although persons in custody have no constitutional right to use the bathroom whenever they please, *see, e.g.*, *Odom v. Keane*, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997), "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs . . . ."  *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994). Courts have generally found, however, that a temporary deprivation of bathroom

facilities does not rise to the level of an Eighth Amendment violation.  *See, e.g., Jones v. Marshall,* 2010 WL 234990, at *3 (S.D.N.Y. Jan. 19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* 2008 WL 619167, at *3 (N.D.N.Y. Feb. 8, 2008) (noting that "[t]he temporary deprivation of restroom privileges for a three hour period does not constitute an extreme deprivation of life's necessities"); *Bourdon v. Roney*, 2003 WL 21058177, at *11 (N.D.N.Y. Mar. 6, 2003) (three hour deprivation of bathroom privileges did not constitute Eighth Amendment violation); *Qawi v. Howard*, 2000 WL 1010281, at *3-4 (D. Del. July 7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Whitted v. Lazerson*, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (holding that an inmate's Eighth Amendment rights were not violated when he was occasionally prevented from using the restroom and thus urinated or defecated on his clothing); *Odom*, 1997 WL 576088, at *4 (finding that the absence of a working toilet in an inmate's cell for several hours "does not rise to the level of cruel and unusual punishment").

McGee argues that Defendants' case citations are distinguishable because he was deprived of bathroom access regularly and as a matter of policy.  He compares his situation to that in *Shariff v. Coombe*, 655 F. Supp. 2d 274, 298-300 (S.D.N.Y. 2009), a case brought by wheelchair-bound inmates.  The plaintiffs in *Shariff* testified that they had urinated and defecated on themselves several times per week, and had at times

suffered injuries trying to use handicap-inaccessible bathrooms.  While the court did note that cases involving one-time denials of bathroom access were distinguishable, its analysis focused on the injuries suffered: "The sheer frequency with which these incidents occur – not to mention the physical injuries that at least some Plaintiffs have suffered in attempting to use an inaccessible restroom – indicates that Plaintiffs have been denied 'the minimal civilized measure of life's necessities' in violation of the Eighth Amendment."  *Shariff*, 655 F. Supp. 2d at 298.  McGee's injury – the fact that he was forced to urinate into a cup – was far less serious, and thus distinguishable from the facts in *Shariff*.

Furthermore, even assuming that McGee could show that having to wait two hours between bathroom visits was sufficiently serious under the Eighth Amendment, the Complaint does not allege deliberate indifference to a health risk.  *See Farmer*, 511 U.S. at 834.  On the one alleged occasion that McGee was forced to urinate into a coffee mug, he awoke in the middle of the night and an officer did not respond to his calls for approximately twenty minutes.  (Doc. 7 at ¶¶ 81-92.)  McGee now alleges that he had an enlarged prostate, but does not suggest that his condition was, or should have been, known to the Correctional Officer on duty.  While the wait was undoubtedly uncomfortable, the officer's alleged action – effectively ignoring McGee's calls while "chatting" on the internet – did not amount to the sort of deliberate indifference to an excessive risk of harm that runs afoul of the Eighth Amendment.  *See Vacca v. Scott*, 119 F. App'x 678, 679 (5th Cir. 2005) (finding that, although plaintiff averred that defendants acted with deliberate indifference in denying him access to a bathroom, at most he

alleged that he suffered generalized pain and discomfort, which is insufficient to state an Eighth Amendment violation).

### B.       Denial of Drinking Water (Count 1)

Count 1 of the Complaint also alleges that McGee was denied drinking water between 10 p.m. and 6 a.m.  McGee does not allege that he was denied access to drinking water outside of ordinary sleeping hours, and the Eighth Amendment does not require access to drinking water at all times.  *Mortimer Excell v. Fischer*, 2009 WL 3111711,  at *5-*6 (N.D.N.Y. Sept. 24, 2009); *Bolin v. Rice*, 2000 WL 342676, at *5 (N.D. Cal. Mar. 30, 2000) ("As long as an inmate's meals included a beverage, the temporary denial of drinking water presents no constitutional issue.") (citing *Tesch v. County of Green Lake*, 157 F.3d 465, 475-76 (7th Cir. 1998)).  Accordingly, to the extent that McGee was denied drinking water during the night, there was no constitutional violation.

### C.       Inability to Wash Hands with Soap (Count 1)

McGee further alleges that after urinating in his cell he could not wash his hands immediately, and that only later was he allowed rinse his hands without soap.[1]  These claims fall far short of alleging an Eighth Amendment violation.  *See, e.g., Harris v. Fleming*, 839 F.2d 1232, 1234-36 (7th Cir. 1988) (holding that prisoner did not state a claim when prison officials negligently deprived him of soap, toothbrush, and toothpaste for ten days); *Fernandez v. Armstrong*, 2005 WL 733664, at *5 (D. Conn. Mar. 30, 2005) (denial of hygiene items, including soap, for sixteen days did not allege a violation of

---

[1]  McGee does not allege that he was denied soap entirely, but instead that he was not allowed to take soap with him to the bathroom.  (Doc. 7 at ¶ 96.)

Eighth Amendment rights); *Fisher v. Dep't of Corr.*, 1995 WL 608379, at *5 (S.D.N.Y. Oct. 16, 1995).

Because none of the claims set forth in Count 1 of the Complaint rise to the level unconstitutional conduct, I recommend that Count 1 be DISMISSED.

### D.   Inadequate Clothing (Count 3)

Defendants also argue for dismissal of Count 3, in which McGee alleges that he was denied adequate clothing. McGee was transferred from Kentucky to SSCF in Vermont in 2007, and claims that he was not provided any clean clothing during the two and a half days he spent at SSCF. He was then transferred to CRCF, but was "unable to have any street clothing sent into him because his family in Vermont, who had Plaintiff's clothing, was [out of state] in Connecticut caring for a sick relative." (Doc. 7 at ¶ 202.) As a result, McGee did not receive clean clothing during the five and a half days he was held at CRCF. (*Id.* at ¶ 205.)

After CRCF, McGee was housed at NSCF. He claims that the temperatures outside "ranged from 0 to only the low teens," and that although he had no winter jacket, he needed to walk outside each day to reach "NSCF's cafeteria, medical, and education/recreation buildings, which are separate from the living units." (*Id.* at ¶ 209.) McGee's underclothes arrived from Kentucky one month after his transfer, but he still lacked a warm outer layer. A few weeks later, he received a $50 money order from his family, but was unable to buy a winter coat from fellow inmates. His family ultimately sent him a package of clothing approximately three months after his transfer from

Kentucky.  (*Id.* at ¶ 229.)  McGee claims that he complained to prison officials and filed grievances about his clothing situation, but received no relief.

McGee also claims that prison officials forced him to either cut out a string that held up his sweatpants, or remain naked.  He alleges that he chose to go naked rather than have his clothing "destroyed," and that he remained naked for two days before being placed in general population.  (*Id.* at ¶¶ 244-48.)

McGee's allegations regarding a lack of clean clothes again fall short of stating plausible constitutional violations.  Specifically, his claims that he was denied clean clothing, first for two and a half days at SSCF, and then during a five and half day stay at CRCF, do not state Eighth Amendment claims.  *See McCorkle v. Walker*, 871 F. Supp. 555, 557 (N.D.N.Y. 1995) (no Eighth Amendment violation where plaintiff was not given a change of underwear for fifteen days); *Chavis v. Fairman*, 1995 WL 156599, at *5 (3d Cir. Apr. 6, 1995) (court found no violation where inmate was forced to wear same uniform for three weeks); *Roberts v. Dep't of Corr.*, 1996 WL 526779, at *4 (N.D. Ill. Sept. 12, 1996) (holding that where inmates were forced to wear the same set of clothing for thirteen days, "such a short period of time without a change of clothing is nothing more than a temporary inconvenience and hardly rises to the level of the unnecessary and wanton infliction of pain.").  Similarly, his allegation that he had to wear the same clothes for a significant period of time while at NSCF does not rise to the level

of a constitutional violation.[2]  (Doc. 7 at ¶¶ 206, 215, 229); *see Chavis*, 1995 WL 156599, at \*5; *Moss v. DeTella*, 1997 WL 24745, at \*2 (N.D. Ill. Jan. 16, 1997) (holding that lack of clean clothes and bedding for 111 days did "not rise to the level of a constitutional violation"); *Coughlin v. Sheahan*, 1995 WL 12255, at \*3 (N.D. Ill. Jan.12, 1995) (allegation that inmate was provided only one change of clothing in a three-month period did not support Eighth Amendment claim).

McGee's claims regarding exposure to cold weather, however, are sufficient to survive Defendants' motion to dismiss.  Exposure to extreme cold as a result of the denial of adequate winter clothing can provide a basis for finding that an Eighth Amendment violation has occurred.  *See Corselli v. Coughlin*, 842 F.2d 23, 27(2d Cir. 1988); *Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967).  Indeed, "[a]dequate clothing is one of the necessities of life which prison officials cannot deprive an inmate."  *Gordon v. Faber*, 800 F. Supp. 797, 800 (N.D. Iowa), *aff'd*, 973 F.2d 686 (8th Cir. 1992); *see also Davidson v. Coughlin*, 920 F. Supp. 305, 309 (N.D.N.Y. 1996) (holding that defendants had failed to show at summary judgment "how the clothing issued is sufficiently suitable for the harsh winter climate of upstate New York"); *Balla v. Idaho St. Bd. of Corr.*, 595 F. Supp. 1558, 1575 (D. Idaho 1984) (providing prisoners with clothing that is "patently insufficient to protect them from cold winter months" is a violation of the Constitution).

---

[2]  McGee concedes that "laundry services were available."  (Doc. 71 at 32.)  He also contends in his opposition memorandum that he was "forced to wear the same set of indoor clothing for nearly four months."  (*Id.* at 31.)  The Complaint, however, alleges that he was transferred from Kentucky to Vermont on January 9, 2007, that "several changes of underclothes" arrived from Kentucky on February 9, 2007, and that he "finally received a package of clothing from his family" on April 12, 2007.  (Doc. 7 at ¶¶ 196, 215, 229.)  Therefore, at most, McGee did not have a change of outer layers for approximately three months.

Factors to be considered with regard to an alleged denial of adequate cold weather clothing include the length of exposure and temperatures experienced.  *See, e.g. Gaston v. Coughlin*, 249 F.3d 156, 164-65 (2d Cir. 2001).

   Here, McGee's allegation of enduring several weeks in the middle of a Vermont winter without a coat or other adequate clothing, and of the failure of prison officials to help him remedy the situation, states a claim under the Eighth Amendment.  Although short periods of exposure may not have been unconstitutional, the record thus far does not establish the length or frequency of McGee's exposures as he traveled from building to building at NSCF.  *See Koehl v. Bernstein*, 2011 WL 2436817, at *18 (S.D.N.Y. June 17, 2011) (no Eighth Amendment violation where inmate did not have appropriate clothing for outside recreation).  Because the Complaint alleges a significant period of time in which McGee had inadequate clothing during the winter, the Court should decline to dismiss this claim under Rule 12(b)(6) for lack of plausibility.

   Finally, Defendants argue that McGee chose not to wear his sweatpants rather than have the string removed.  McGee contends that his choice was between the destruction of his clothing and having to go naked.  The Court has found no case law directly on point, aside from the general principle that privacy interests of an inmate must be balanced with legitimate security interests of the institution.  *See, e.g., Canedy v. Boardman*, 16 F.3d 183, 185-87 (7th Cir. 1994).  Because Defendants have not completely briefed whether the choice presented to McGee amounted to a constitutional violation, or whether there was a legitimate penological reason for denying him the string to his sweatpants, the Court should not dismiss McGee's claim at this time.

1.      **Personal Involvement**

a.      **Legal Standard**

Because I am not recommending dismissal of Count 3 in its entirety, I must

consider Defendants' personal involvement arguments.  Defendants Kupec, Hofmann,

Martinson and Pallito, all of whom are named because of their roles as supervisors,

contend that the Complaint does not allege facts that would render them liable under §

1983.[3]  Before the Court undertakes a personal involvement analysis, it must determine

the appropriate legal standard, as the standard for supervisor liability under § 1983 has

been a matter of debate since the Supreme Court's decision in *Ashcroft v. Iqbal*.  *See*

*generally D'Olimpio v. Crisafi*, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (collecting

cases).

In *Iqbal*, the Supreme Court held that "[b]ecause vicarious liability is inapplicable

to . . . [§] 1983 suits, a plaintiff must plead that each Government-official defendant,

through the official's own individual actions, has violated the Constitution."  129 S. Ct. at

1948.  The Supreme Court explicitly rejected the argument that "a supervisor's mere

knowledge of his subordinate's discriminatory purpose amounts to the supervisor's

violating the Constitution."  *Id.* at 1949.  Thus, "[a]bsent vicarious liability, each

Government official, his or her title notwithstanding, is only liable for his or her own

misconduct."  *Id.*

---

[3]  Other Defendants named in Count 3, for whom no such argument is made, include Defendants
Fitzpatrick, Brochu and Quijano.

Prior to *Iqbal*, Second Circuit precedent provided for supervisor liability not only where the supervisor was directly involved, but also where he or she had been made aware of misconduct and had failed to take corrective action. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Liability could also attach where a supervisor had created policies or customs that allowed for, or resulted in, unconstitutional practices. *Id.* Specifically, *Colon* held that supervisor liability "may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Post-*Iqbal*, lower courts in this Circuit have had to determine whether all of the *Colon* factors remain good law. In some instances, consistent with the *Iqbal* holding, courts have held that a supervisory defendant cannot be held liable under § 1983 unless that defendant actively deprived the plaintiff of his or her constitutional rights. *See, e.g., Newton v. City of New York*, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009) ("passive failure to train claims pursuant to § 1983 have not survived the Supreme Court's recent decision in [*Iqbal* ]"). Recent decisions have generally been careful to note, however, that *Iqbal* involved equal protection and discrimination claims, each of which require proof of

discriminatory intent.  *See, e.g., Plair v. City of New York*, 2011 WL 2150658, at *4

(S.D.N.Y. May 31, 2011) (citing *Iqbal*, 129 S. Ct. at 1948).  Indeed, the Supreme Court

held that a supervisor's "mere knowledge of his subordinate's *discriminatory purpose*"

does not amount to a constitutional violation.  *Id.* at 1949 (emphasis supplied).  The

Supreme Court also allowed that "the factors necessary to establish a [constitutional]

violation will vary with the constitutional provision at issue."  *Id.* at 1948.  Several courts

in this Circuit have therefore retained the traditional *Colon* factors for claims that do not

involve discriminatory intent.  *See, e.g., Jackson v. Goord*, 664 F. Supp. 2d 307, 324 n.7

(S.D.N.Y. 2009) (holding that *Colon* standard is unaffected by *Iqbal* in deliberate

indifference case, because *Iqbal* "involved discriminatory intent.").

Defendants argue that the *Colon* factors did not survive *Iqbal*, and that instead the

Court should look only at (1) whether the supervisor directly participated in the violation,

or (2) whether the supervisor created a custom or policy under which the violation

occurred.  (Doc. 59 at 11-12.)  For support, they cite *Bellamy v. Mount Vernon Hosp.*,

2009 WL 1835939, at *4, *6 (S.D.N.Y. June 26, 2009), *Joseph v. Fischer*, 2009 WL

3321011, at *14 (S.D.N.Y. Oct. 8, 2009), and *Newton*, 640 F. Supp. 2d at 448.  However,

"[s]ubsequent decisions have noted that *Bellamy, Joseph, Newton*, and similar rulings

may overstate *Iqbal's* impact on supervisory liability," and have instead held that

"[w]here the constitutional claim does not require a showing of discriminatory intent, but

instead relies on the unreasonable conduct or deliberate indifference standards of the

Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v.

Coughlin* may still apply."  *Plair*, 2011 WL 2150658, at *5 (citing *Sash v. United States*,

674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009); *D'Olimpio*, 718 F. Supp. 2d 340, 347

(S.D.N.Y. 2010); *Qasem v. Toro*, 737 F. Supp. 2d 147, 151 (S.D.N.Y. 2010) (declining to

adopt the "narrow interpretation of *Iqbal*" advanced by *Bellamy, Joseph* and *Newton*).

Given the language in *Iqbal* cautioning courts to examine "the constitutional

provision at issue," 129 S. Ct. 1948, this Court should follow this latter line of cases, and

should not discard the *Colon* factors where the claim does not require a showing of

discriminatory intent. As the *Sash* decision noted, "[i]t was with intent-based

constitutional claims in mind, specifically racial discrimination, that the Supreme Court

rejected [in *Iqbal* ] the argument that a supervisor's mere knowledge of his subordinate's

discriminatory purpose amounts to the supervisor's violating the Constitution." 674 F.

Supp. 2d at 544. Where a claim does not require a showing of discriminatory intent, "the

*Colon* analysis should still apply, insofar as it is 'consistent with the particular

constitutional provision alleged to have been violated.'" *Delgado v. Bezio*, 2011 WL

1842294, at *9 (S.D.N.Y. May 9, 2011) (quoting *Qasem*, 737 F. Supp. 2d at 151-52).

### b. Personal Involvement Alleged in Count 3

In Count 3, McGee does not assert the sort of intentional discrimination presented

in *Iqbal.* Instead, he claims deliberate indifference in violation of the Eighth

Amendment. Courts in this Circuit have generally applied the five *Colon* factors to such

a claim. *See Plair*, 2011 WL 2150658, at *4 ("other judges in the Second Circuit have

continued to cite all five of the *Colon* categories as the bases for establishing supervisory

liability in cases alleging violations of a plaintiff's Fourth and Eighth Amendment

rights").

Defendants first argue that McGee has not alleged sufficient personal involvement on the part of Defendant David Martinson, the Assistant Superintendent at NSCF.  The allegation against Martinson is that, after Defendant Quijano's investigation concluded that no further action was needed with regard to the clothing issue, Martinson concurred and denied McGee's Grievance #2.  (Doc. 7 at ¶¶ 234-35.)  There is no suggestion in the Complaint that Martinson did anything aside from merely affirming the denial.  It also appears from the Complaint that Martinson issued the affirmance after McGee had received additional clothing from his family.  (*Id.* at ¶¶ 229, 235).

"[A]ffirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca*, 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing *Foreman v. Goord*, 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")).  As was noted in *Thompson v. New York*, 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (citations omitted).  Furthermore, to the extent that courts have found affirmance of a grievance to constitute personal involvement, many of those cases have involved ongoing violations. *See Thomas v. Calero*, 2011 WL 1532058, at *14, *17 (S.D.N.Y. Mar. 17, 2011) (collecting cases, and noting "uncertainty in the law" on this point).  Here, the fact that McGee had

22

received his clothing by the time Martinson issued a response to the grievance means that there was no ongoing violation, at least with respect to McGee while housed at Martinson's facility (NSCF).  The Court should therefore find that the minimal allegations against Defendant Martinson are insufficient to establish his personal involvement.

McGee's allegations against Defendant Kupec, the Facilities Executive at the DOC Central Office, and former DOC Superintendent Hofmann, are that they each responded to his grievance appeals in writing, characterizing his claims as "meritorious in part."  (Doc. 7 at ¶¶ 230, 237.)  Defendant Kupec also allegedly wrote that he was "sorry" and that "inmates in [McGee's] circumstances should have an alternative to remaining in the same clothing, day in, day out."  (*Id.* at ¶ 231.)  Despite their agreement with at least some of McGee's claims, Kupec and Hofmann allegedly failed to remedy what McGee claims was a continuing, and problematic, practice in DOC and out-of-state prisons: providing clothing to inmates in some facilities and sending their personal clothing to relatives or into storage, and then upon a prison transfer, requiring those same inmates to provide their own clothing.

Based upon these allegations, the Court should find that Kupec and Hofmann were both directly involved in the grievance process, and were not merely "rubber-stamping" an administrative denial.  *See Woodward v. Mullah*, 2009 WL 4730309, at *3 (W.D.N.Y. Dec. 7, 2009); *Charles v. N.Y. State Dep't of Corr. Servs.*, 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (drawing a distinction between a supervisor who simply affirms the denial of a grievance and a supervisor who "receives and acts on a prisoner's

grievance or otherwise reviews and responds to a prisoner's complaint") (citing *Warren v. Goord*, 476 F. Supp. 2d 407, 413 (S.D.N.Y. 2007)).  Defendants argue that under the *Bellamy* and *Joseph* reasoning, mere knowledge of a violation is insufficient.  (Doc. 59 at 17.)  For the reason discussed above regarding the appropriate legal standard, those limited readings of *Colon* should not be applied here, and the motion to dismiss Defendants Kupec and Hofmann from Count 3 should be DENIED.

Finally, Defendants' argument for the dismissal of current DOC Commissioner Pallito from Count 3 is misplaced.  Personal involvement is required for an award of damages under § 1983.  *Farrell*, 449 F.3d at 484.  In Count 3, however, McGee is only seeking injunctive relief from Defendant Pallito.  (Doc. 7 at ¶ 803); *see Hall v. Marshall*, 479 F. Supp. 2d 304, 318 (E.D.N.Y. 2007).  The motion to dismiss Defendant Pallito from Count 3 for lack of personal involvement should therefore be DENIED.

### E.      Conditions during Lockdown Drill (Count 4)

Defendants next move to dismiss McGee's fourth cause of action, in which he complains of his prison conditions during a lockdown drill.  McGee focuses on the lack of running water during the lockdown, but concedes that he was given eight ounce drinks at breakfast, lunch and dinner, and a four ounce drink in the mid-afternoon.  As discussed above, so long as inmates are provided drinks at mealtimes, temporary deprivations of drinking water are not unconstitutional.  *See, e.g., Mortimer Excell*, 2009 WL 3111711, at *5-*6; *Bolin*, 2000 WL 342676, at *5; *Johnson v. Comm'r of Corr. Servs.*, 699 F. Supp. 1071, 1074 (S.D.N.Y. 1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals).

24

McGee's fourth claim also alleges that because the water was shut off, he could not flush his toilet and was therefore exposed to unsanitary conditions.  Courts facing similar, and in some instances more egregious, facts have denied relief under the Eighth Amendment.  *See Smith v. Copeland*, 87 F.3d 265, 269 & n.3 (8th Cir. 1996) (finding no violation when prisoner was confined to cell with overflowed toilet for four days); *Odom*, 1997 WL 576088, at *4-5 (lack of a working toilet in prison cell for approximately 10 hours "does not rise to the level of cruel and unusual punishment").  In *Smith*, the Eighth Circuit commented that not every "overflowed toilet in a prison amounts to a constitutional violation."  87 F.3d at 268.  The court noted that "the length of time a prisoner is subjected to harsh conditions is a critical factor in our analysis," and that cell conditions that "may be tolerable for a few days are intolerably cruel for weeks or months."  *Id.*

Here, the lockdown drill lasted twenty-four hours, and water was shut off for twenty hours.  McGee claims that "noxious odors from the unflushable toilets became so amassed and severe they escaped the confines of individual cells and permeated entire buildings."  (Doc. 7 at 35.)  His claims, however, do not approach the sort of extended deprivations that have been found to violate the Eighth Amendment.  *See, e.g., Gaston*, 249 F.3d at 166 (exposure to raw sewage "for days on end" stated viable Eighth Amendment claim).  McGee's allegations of unconstitutional conditions during the lockdown drill should therefore be DISMISSED.

F.      "Fishtank" Confinement (Count 7)

Defendants next attack McGee's claims in Count 7, in which he alleges that he was confined in the "fishtank" with a group of other prisoners for four days.  As set forth above, his claims are that the cell was crowded, the bedding was thin and dirty, access to personal hygiene items was limited to once per day, and ants crawled onto his bedding. Again, the relatively short duration of McGee's exposure to such conditions undermines the viability of his claims.  *See Hutto v. Finney*, 437 U.S. 678, 687 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards.  A filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks and months."); *Wright*, 387 F.2d at 526 ("civilized standards of humane decency . . . do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, *i.e.*, 33 days); *Mahase v. City of New York*, 2000 WL 263742, at *6 (E.D.N.Y. Jan. 5, 2000) (noting that "short-term confinement under unsanitary or uncomfortable conditions, without more, typically does not amount to a constitutional violation").

While the conditions in the "fishtank" may have been both crowded and arguably unsanitary, a four-day stay in such conditions does not violate the Constitution.  *See, e.g., White v. Nix,* 7 F.3d 120, 121 (8th Cir. 1991) (eleven-day stay in unsanitary cell not unconstitutional); *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (five-day stay in filthy, roach-infested cell is not of sufficient duration for a constitutional violation).  Similarly, restricting access to hygiene items to once per day during this four-

26

day period did not amount to denial of McGee's constitutional rights.  *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir. 2003) (deprivation of "toiletries for approximately two weeks - while perhaps uncomfortable" did not violate Eighth Amendment); *Davidson v. Murray*, 371 F. Supp. 2d 361, 372 (W.D.N.Y. 2005) (finding that an Eighth Amendment violation was not established, based upon conditions "amount [ing] to no more than occasional or temporary deprivations of personal hygiene items, with no . . . indicat[ion] that plaintiff suffered any 'specific deprivation of a single human need' . . . , or other accompanying harm") (citation omitted); *Fernandez v. Armstrong*, 2005 WL 733664, at *5-6 (D. Conn. Mar. 30, 2005) (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

Finally, McGee's allegations of ants on his bedding are insufficient to state a constitutional violation, particularly when there is no accompanying allegation of harm or injury.  *See, e.g, Summerville v. Faciuna*, 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009) (no Eighth Amendment claim where plaintiff failed to "point to any evidence suggesting that [defendant] acted with reckless indifference to Plaintiff's health and safety by allowing him to be exposed to bugs."); *Davidson*, 371 F. Supp. 2d at 370 ("Nothing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."); *Govan v. Campbell*, 289 F. Supp. 2d 289, 296-97 (N.D.N.Y. 2003) (holding that cockroach problem in cells did not rise to level of a constitutional violation); *Wilson v. Schomig*, 863 F. Supp. 789, 794-95 (N.D. Ill. 1994) (allegations that the plaintiff's "cell contained dirt, dust and roaches, and that his ceiling leaked during rainstorms" are "not sufficiently

serious" to violate the Eighth Amendment).  I therefore recommend that Count 7 be DISMISSED for failure to state a plausible constitutional claim.

### G.    Inadequate Toothbrush (Count 9)

Defendants further move for dismissal of Count 9, in which McGee alleges that he was issued a special toothbrush for one week while housed in segregation.  He describes the toothbrush as "a small, plastic, 'thimble-like' tool . . . ."  (Doc. 7 at ¶ 419.)  He claims that the tool was unsanitary because it forced him to put his fingers inside his mouth, that it would sometimes slip out of his hands and cause him to gag, and that it "gouged the insides of Plaintiff's cheeks, causing lacerations, severe pain, bleeding and lasting sores." (*Id.* at ¶ 423.)  In *Johnson v. Goord*, 12 F. App'x 22 (2d Cir. 2000), the Second Circuit faced an apparently-similar claim, in which New York inmates complained about "dangerous toothbrushes" that "caused bleeding from their mouths and gums."  While the lower court dismissed for failure to exhaust administrative remedies, the Second Circuit concluded that the inmates' claims were frivolous, and thus subject to dismissal under 42 U.S.C. § 1997e(c)(1).

McGee alleges that he was forced to use this "tool" for approximately one week. Courts in this Circuit have held that denying an inmate access to a toothbrush for such a short period of time does not violate the Eighth Amendment.  *See Trammell*, 338 F.3d at 165 (deprivation of toiletries, other than toilet paper, for two weeks does not violate Eighth Amendment); *Fernandez*, 2005 WL 733664, at *5 (denial of hygiene items including a toothbrush, toothpaste, soap, and shampoo for a period of sixteen days does not allege a violation of Eighth Amendment rights); *Chavis v. Kienert*, 2005 WL

2452150, at *21 (N.D.N.Y. Sept. 30, 2005) (denial of toiletries for a two month period did not rise to the level of deliberate indifference to the prisoner's health or safety)).

McGee does not claim that he was denied any toiletries or teeth-cleaning devices whatsoever.  Instead, he claims that the special toothbrush he was issued for a one-week period caused him discomfort and bleeding, and was arguably unsanitary.  As the case law above makes clear, a complete deprivation for four days would not have violated the Constitution.  Consequently, provision of a cleaning tool, though allegedly inadequate, also cannot violate the Constitution.  I therefore recommend that Count 9 of the Complaint be DISMISSED.

## III.    Medical Care Claim (Count 11)

In Count 11, McGee claims that several of his medications were either allowed to expire without automatic renewal, or were wrongfully discontinued, "causing Plaintiff to go without the medications for, at times, over a week."  (Doc. 7 at ¶ 489.)  McGee's alleged medical conditions included "environmental allergies; back & knee pain; intestinal pain & bleeding; migraine headaches; and depression, bipolar, & anxiety disorders."  (*Id.* at ¶ 488.)  He claims that, because of the regular discontinuation of his medications, "he suffered pain and degeneration of his medical and mental health conditions, which interfered with his daily activities."  (*Id.* at ¶ 491.)

In order to state an Eighth Amendment claim regarding health care while in prison, an inmate must again satisfy both objective and subjective components.  Objectively, the alleged deprivation must be "sufficiently serious."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The Second Circuit has characterized the necessary level of

suffering as that which would produce death, degeneration or extreme pain.  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions.  *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

There can be little doubt that McGee's claims satisfy the subjective portion of the deliberate indifference standard.  The Second Circuit has made clear that "a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians."  *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (citing *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors.")).  The allegation that medications were discontinued for financial purposes also suggests a state of mind that could plausibly amount to deliberate indifference.  *See Chance v. Armstrong*, 143 F.3d 698, 704 (2d Cir. 1998) (the "allegation of ulterior motives [*i.e.*, monetary incentives], if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment.").

Consequently, Defendants move to dismiss on the basis of the objective prong, arguing that the alleged delays in McGee's medications were not sufficiently serious to establish an Eighth Amendment claim.  They also argue that, with regard to McGee's allegations of harm, his claims of "pain and degeneration" lack sufficient detail.  In *Iqbal*, the Supreme Court cautioned that a complaint must include more than "a formulaic recitation of the elements."  129 S. Ct. at 1951.  By citing "degeneration" and "pain,"

30

McGee is merely echoing the requirements for the objective prong of the Eighth Amendment standard. *See Hathaway*, 99 F.3d at 553. The Complaint does not set forth any specific claims about which of his many ailments were impacted, or the physical manifestations of his alleged "degeneration" and "pain."

In his opposition memorandum, however, McGee provides additional details about his pain and suffering. With regard to his mental health ailments, he claims that his missed medications "resulted in Plaintiff's depression, anxiety, and bipolar disorder severely worsening: Plaintiff grew depressed and withdrawn, had anxiety attacks, and turned into a 'shut in' unable to leave his cell due to the distress." (Doc. 71 at 70.) Physical symptoms allegedly included severe migraine headaches and intestinal bleeding. (*Id.* at 71.) Such claims may be sufficiently serious to satisfy the Eighth Amendment standard. *See, e.g., Mahan v. Plymouth Cty. House of Corr.*, 64 F.3d 14, 16-18 (1st Cir. 1995) (severe depression and anxiety attacks); *DeJesus v. Albright*, 2011 WL 814838, at *9 (S.D.N.Y. Mar. 9, 2011) (migraine headaches).

While a court generally may not look beyond the pleadings when considering a motion to dismiss under Rule 12(b)(6), "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord*, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997); *see also Cusamano v. Sobek*, 604 F. Supp. 2d 416, 461 (N.D.N.Y. 2009) (holding that requirement of reading *pro* se submissions generously "makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those

factual assertions are consistent with the allegations of the plaintiff's complaint.") (citations omitted).  Here, McGee's opposition memorandum includes additional allegations of serious medical harm, sufficient to withstand the motion to dismiss.

The Court must therefore again turn to the question of personal involvement. Although several Defendants are named in Count 11, the only personal involvement argument is presented on behalf of Commissioner Pallito.  Specifically, Defendants argue that Commissioner Pallito cannot be held liable because he merely affirmed denial of McGee's grievance.  (Doc. 59 at 23.)  The Complaint, however, alleges the Pallito both received and investigated the grievance, (Doc. 7 at ¶ 505), and in his opposition memorandum, McGee states that Pallito himself wrote that he had received the grievance, and that he concurred with his medical staff.  (Doc. 71 at 73) ("Specifically, Defendant Pallito stated, in part, 'I have received your Appeal regarding your medication . . .  Please be advised that I concur with Dr. Burroughs-Biron's findings, a copy of which I have attached.'")  McGee also claims that the problems with his medications were ongoing, and the Commissioner failed to remedy the problem.  Given these allegations, I recommend that the motion to dismiss Defendant Pallito for lack of personal involvement be DENIED.

## IV.   Access to Courts Claim (Count 10)

Defendants next move to dismiss Count 10, in which McGee claims that he was denied access to his legal materials, and thus denied his constitutional right to access the courts.  Since the Defendants filed their motions, this claim has been dismissed by the parties with prejudice.  (Doc. 68.)

**V.     Retaliation Claims (Counts 2, 5, 6 and 12)**

    **A.     First Alleged Retaliatory Transfer (Count 2)**

McGee also alleges several instances of retaliation.  As discussed previously, Count 2 alleges that after he filed a lawsuit in Vermont, McGee was wrongfully transferred from Kentucky to Vermont for a deposition.  McGee claims that the prison conditions in Vermont were less favorable than those to which he had become accustomed in Kentucky, and that the transfer denied him access to his legal files for a period of time.  The deposition was initially postponed after McGee's successful challenge in state court, was rescheduled, was suspended upon McGee's own motion, and was never concluded.  McGee alleges in Count 2 that "he was transferred from Kentucky back to Vermont, not for the legitimate purpose of a deposition, but as pretext for the true purpose of retaliation for filing a lawsuit and to deliberately disrupt his ability to litigate." (Doc. 7 at ¶ 182.)

"[P]rison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights . . . ."  *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998).  In order to establish a claim of retaliation for the exercise of a constitutional right, McGee must show (1) that he engaged in constitutionally protected conduct, and (2) that the conduct was a substantial motivating factor for "adverse action" taken against him by Defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).  The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'"  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citations

omitted).  The Second Circuit has also cautioned that claims of retaliation are "easily fabricated," "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration," and that they must therefore be supported by non-conclusory allegations.  *Bennett*, 343 F.3d at 137 (citation omitted).

In support of his retaliation claim, McGee alleges that Assistant Attorney General Kuehl, who was both opposing counsel in the state court litigation and the one who allegedly requested the prison transfer, stated during a telephone conversation that he could "transfer Plaintiff wherever he wanted," and that McGee did not "'have any rights.'"  (Doc. 7 at ¶ 140-41.)  McGee also claims that Kuehl scheduled the deposition so as to interfere with his ability to file a dispositive motion in the state court case.  In sum, he claims that the timing of his transfer, "as well as Defendant Kuehl's statement in relation to the deposition and transfer," demonstrate a causal connection between protected activity and the actions taken by Defendants.  (*Id.* at ¶ 184.)

Accepting McGee's allegations as true, his claims nonetheless fail to state a plausible claim.  Attorney Kuehl noticed McGee's deposition in a case that was initiated by McGee himself.  The case was brought in Vermont, and McGee should have reasonably expected that he would need to appear here for depositions or other proceedings.  His deposition was scheduled, and it necessarily required a transfer from the facility in Kentucky.  While a deposition by telephone or video might have been an option, Attorney Kuehl was not required to agree to such an alternative, and the fact that Kuehl required an in-person deposition does not lead to an inference of retaliation.

The timing of the deposition does not support McGee's claim, as scheduling a deposition near the end of discovery, and thus near the deadline for dispositive motions, is not unusual.  Indeed, there is an "obvious alternative explanation" for the fact and timing of McGee's transfer from Kentucky, aside from any claim of retaliation.  *Iqbal*, 129 S. Ct. at 1951-52.[4]  Finally, any alleged statements by Attorney Kuehl about his ability to transfer an inmate, or the extent of an inmate's rights, while arguably inappropriate, do not bolster McGee's claim that the transfer was retaliatory.  I therefore recommend that Count 2 be DISMISSED.

### B.        Second Alleged Retaliatory Transfer (Count 5)

Count 5, which alleges a second retaliatory transfer, presents an arguably stronger claim.  In Count 5, McGee alleges that on February 12, 2009, a court clerk scheduled jury draws in two of his state court cases.  The draws were to be held on April 15, 2009, unless the parties moved for summary judgment prior to February 28, 2009.  Both parties subsequently moved for summary judgment prior to the deadline, thereby "effectively cancel[ing] the Apr. 15, 2009 jury draws."  (Doc. 7 at ¶ 313.)

On April 5, 2009, McGee, who was being housed in Kentucky at the time, was informed that he was being returned to Vermont.  McGee suspected that the transfer was due to the jury draws, and showed Kentucky officials a copy of a court order canceling the draws.  Efforts to reach DOC staff in Vermont were unsuccessful, and McGee was placed on the transport bus.  McGee now claims that DOC staff deliberately declined to

---

[4]  Furthermore, if McGee's transfer improperly interfered with his ability to litigate, and he suffered prejudice as a result, he could potentially bring an access to courts claim.  *See Lewis v. Casey*, 518 U.S. 343, 351 (1996); *Benjamin v. Fraser*, 264 F.3d 175, 184 (2d Cir. 2001).

respond to calls from Kentucky prison officials prior to his transfer.  He also claims that the transfer denied him access to his legal materials, thus interfering with his ability to litigate, and that the prison conditions upon his arrival in Vermont were unconstitutional.

McGee further claims that Attorney Kuehl "had effective notice that the jury draws had been canceled over a month earlier when the parties had filed summary judgment motions, and that transferring Plaintiff back to Vermont was completely unnecessary."  (*Id.* at ¶ 342.)  He claims that Defendant Kevin Oddy, who worked in the DOC's out-of-state office, also received notice of the canceled jury draws in a fax from Kentucky prison officials dated April 6, 2009 – presumably the day of McGee's transfer. Finally, McGee alleges that when he discussed the issue of his transfer with "a Department executive staff person," he was told that the DOC was "'just yanking your chain.'"  (*Id.* at ¶ 349.)

Defendants contend that a transfer from Kentucky to Vermont is not an adverse action, citing case law for the proposition that transfers between facilities with the same level of security are not "sufficiently adverse."  (Doc. 59 at 30) (citation omitted).  The Complaint makes clear, however, that the conditions of McGee's confinement when he arrived in Vermont were more severe than those he had experienced in Kentucky, and that Defendants were aware of those differences.

Defendants also argue that by characterizing the jury draws as "effectively canceled," McGee is admitting that they were not *actually* canceled.  (*Id.* at 30-31.)  The Complaint alleges, however, that McGee showed a prison official in Kentucky "a copy of

the superior court's order canceling the court hearing."  (Doc. 7 at ¶ 320.)  Accepting McGee's allegations as true, the Court must reject Defendants' argument on this point.

In sum, Count 5 essentially claims that Defendants ordered an unnecessary transfer.  A causal link may be inferred from the statement of an un-named DOC official that the Department was intentionally "yanking" McGee's "chain."  The Court should therefore find that Count 5 states a plausible retaliation claim.

Three Defendants – Salem, Kupec, and Pallito – assert that they were not personally involved in the events alleged in Count 5.  The Complaint alleges that Kupec and Pallito reviewed, investigated and denied McGee's grievance.  In his opposition memorandum, McGee asserts that Pallito gave him a detailed response in excess of 150 words.  These allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6).

As to Defendant Salem, the allegation is that as director of the DOC legal division, she was grossly negligent in her supervision of Defendant Kuehl.  (Doc. 7 at ¶¶ 354-55.) Gross negligence by a supervisor is the fourth *Colon* factor.  58 F.3d 873; *see also Reid v. Bezio*, 2011 WL 1577761, at *7 (N.D.N.Y. Mar. 30, 2011) (assuming, without deciding, that *Colon* factors apply to retaliation claim).  However, McGee offers no facts to support his claim.  Specifically, he fails to assert that Salem "had actual or constructive notice of the unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act."  *Merriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989).  Such allegations are necessary for liability to attach under § 1983.  *See, e.g.,*

*Smith v. Dep't of Corr.*, 2007 WL 678549, at *4 (D. Conn. Mar. 1, 2007). The motion to dismiss Count 5 with respect to Defendant Salem should therefore be GRANTED.

### C.    Third Alleged Retaliatory Transfer (Count 6)

McGee's third retaliatory transfer claim, set forth in Count 6, alleges that he was transferred from CRCF to SSCF after filing a series of grievances. When Defendant Richard Byrne, a living unit supervisor at CRCF, informed Defendant Greg Hale, the superintendent at CRCF, that McGee's claims raised "valid issues," Hale's alleged response "was to ask how soon Plaintiff could be transferred to another facility." (*Id.* at ¶ 361.) One day after Byrne's conversation with Hale, McGee was transferred to SSCF. McGee claims that the conditions at SSCF were "grossly overcrowded," and that as a result he spent nearly four days in the "fish tank" and an additional eight days "in segregation under punitive conditions." (*Id.* at ¶ 366.)

McGee's filing of grievances represented protected activity. *See Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003) (citation omitted). Further, the Second Circuit has held that transfers to other facilities or housing units can, under certain circumstances, satisfy the adverse action requirement. *See Davis*, 160 F.3d at 920 (transfer from one state prison facility to another constituted an adverse action). However, this is not such a case, as it is not apparent from the Complaint whether Defendant Hale was aware that McGee would be placed in more severe conditions when he arrived at SSCF. Without such knowledge on the part of a defendant, the Court cannot find it plausible that the defendant intended the prison transfer to result in "adverse" consequences. *See, e.g., Barnes v. Craft*, 2008 WL 3884369, at *12 (N.D.N.Y. Aug. 18,

2008) ("it is appropriate for a court to focus on the adverse action *caused by the defendant or defendants in question* (rather than whatever bad things happened to the plaintiff following the taking of adverse action by the defendant or defendants)") (emphasis and parenthetical in original).  I therefore recommend that Count 6 be DISMISSED.

### D.       Retaliatory Destruction of Legal Materials (Count 12)

Defendants argue that Count 12 of the Complaint is barred by claim preclusion. McGee alleges in Count 12 that prison officials at SSCF deliberately mishandled his legal materials in retaliation for his grievances and lawsuits.  In November 2009, McGee filed a "Complaint for Writ of Replevin in Detinet" in Windsor Superior Court, asking the state court to order the return of his personal property, including legal materials.  The case subsequently settled and was dismissed by the parties with prejudice.  Defendants now contend that McGee is merely applying a "new legal theory to apply to the same set of facts."  (Doc. 59 at 35.)

In a federal § 1983 suit, the same preclusive effect is given to a previous state court proceeding as would be given to that proceeding in the courts of the state in which the judgment was rendered.  *See* 28 U.S.C § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82-83 (1984); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 476 (1982).  The Court must therefore decide what preclusive effect the Vermont courts would give to McGee's prior state court proceedings.

Under Vermont law, claim preclusion (also known as *res judicata*) requires (1) a previous final judgment on the merits, (2) in a case that was between the same parties or

parties in privity, and (3) the claim has been or could have been fully litigated in the prior proceeding. *In re St. Mary's Church Cell Tower*, 910 A.2d 925, 926 (Vt. 2006).  Under Vermont law, a stipulated settlement and dismissal has full preclusive effect.  *See Johnston v. Wilkins*, 830 A.2d 695, 699 (Vt. 2003).  There can also be little doubt that the same parties or parties in privity were involved. *See, e.g., Vega v. Lantz*, 2006 WL 2788374, at *5 (D. Conn. Sept. 26, 2006) (finding privity among employees of Department of Correction) (citing *Sunshine v. Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402-03 (1940); *Cullen v. Paine Webber Group, Inc.*, 689 F. Supp. 269, 278 (S.D.N.Y. 1988)).

However, there is a well-recognized exception to claim preclusion where the court in the first action had limited jurisdiction with respect to the available remedies.  *See Nestor v. Pratt & Whitney*, 466 F.3d 65, 73 (2d Cir. 2006).  As explained in § 26(1)(c) of the Restatement (Second) of Judgments, this exception applies where

> [t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief. . . .

Restatement (Second) of Judgments § 26(1)(c) (1982); *see also Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 382 (1985) ("With respect to matters that were not decided in the state proceedings . . . claim preclusion generally does not apply where 'the plaintiff was unable to ... seek a remedy because of the limitations on the subject matter jurisdiction of the courts.'") (quoting Restatement (Second) of

Judgments § 26(1)(c) (1982)).  Although not applied in this precise context, the Vermont

Supreme Court has adhered to the general principle set forth in § 26 of the Restatement.

*See State v. Carroll*, 765 A.2d 500, 502 (Vt. 2000) (citing Restatement (Second) of

Judgments § 26).

Here, McGee sought injunctive relief in a state court proceeding pursuant to Vt. R.

Civ. P. 64 and 12 V.S.A. §§ 5331 *et seq.*  He reports that while some of his property was

recovered, the legal materials were never found.  (Doc. 71 at 105.)  McGee is now

seeking damages for the unrecovered items.  His memorandum cites state case law for the

proposition that "Vermont replevin statutes do not provide for recovery of value of items

not replevied."  (*Id.*) (citing *Bagley v. Cooper*, 99 A. 230 (Vt. 1916)).

Defendants have not countered McGee's argument, and the Court has found no

authority to the contrary.  Accordingly, it appears that McGee could not have recovered

damages in his replevin action, and that he is not barred by claim preclusion from seeking

such relief here.  Defendants' motion to dismiss Count 12 on the basis of claim

preclusion should therefore be DENIED.

Moving to the question of personal involvement, McGee's allegations of

supervisory action with regard to the events alleged in Count 12 are minimal.  The

Complaint asserts a single claim that "Defendants Carbonell, Kamel, Kupec, and Pallito

investigated, but did not formally respond to, Plaintiff's grievances pertaining to his

'missing' or destroyed legal materials."  (Doc. 7 at ¶ 570.)  No other facts support the

claim of four separate investigations.  Furthermore, many courts have held that a

supervisor's failure to respond is insufficient to establish personal involvement.  *See*

*Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (collecting cases).  I

therefore recommend that the claims brought against Defendants Carbonell, Kamel,

Kupec, and Pallito be DISMISSED.

McGee also claims that Defendant Salem was personally involved because she

failed to expedite certain directives that would have improved the handling of inmate

property.  (Doc. 7 at ¶¶ 563-64.)  Defendants argue that this claim, which essentially

asserts that a failure to act was the cause of McGee's harm, is insufficient.  In any event,

"personal involvement of defendants . . . is a prerequisite to an award of money damages

under § 1983," *Farid*, 593 F.3d at 249, and no monetary relief is sought from Defendant

Salem in Count 12.  (Doc. 7 at ¶¶ 833-34.)  The motion to dismiss Defendant Salem

should therefore be GRANTED as to any claims for damages.

## VI.    Privacy Claim (Count 8)

In Count 8, McGee claims that he and other inmates had to use a toilet that could

be viewed by female Correctional Officers, thus denying him "his limited right to bodily

privacy" under the Fourth Amendment.  (Doc. 7 at ¶¶ 820-21.)  The Second Circuit has

recognized a limited interest in bodily privacy.  (Doc. 59 at 35) (citing *Covino v. Patrissi*,

967 F.3d 73, 78 (2d Cir. 1992)).  The Circuit Court has also specifically acknowledged

that "the involuntary viewing of private parts of the body by members of the opposite

sex" is a "privacy interest entitled to protection."  *Forts v. Ward*, 621 F.2d 1210, 1216-17

(2d Cir. 1980).

In the prison context, courts have paid particular attention to "the frequency or

regularity of such 'viewing.'  As a general rule, courts have found a violation only in

42

those cases in which guards 'regularly watch inmates of the opposite sex who are

engaged in personal activities, such as undressing, using toilet facilities or showering."

*Miles v. Bell*, 621 F. Supp. 51, 67 (D. Conn. 1985); *see also Covino*, 967 F.2d at 78 (right

to bodily privacy applies "even in the prison context"); *Cumbey*, 684 F.2d at 714 (noting

that "[o]ther courts have held that if guards regularly watch inmates of the opposite sex

who are engaged in personal activities, such as undressing, using toilet facilities, or

showering, the inmates' constitutional rights to privacy are being violated.").

This may be such a case.  McGee claims that the toilet in the "fishtank" could be

viewed both directly and via surveillance camera by female Correctional Officers.

Although a more private inmate bathroom was allegedly available, one such Correctional

Officer, Defendant Sullivan, denied inmates' requests to use it and instead "sat at her

desk doing nothing but laughing and ogling at them."  (Doc. 7 at ¶ 411.)  McGee alleges

that there was no legitimate penological reason for this alleged conduct, and Defendants

have not offered any such reason.

Giving the Complaint the required liberal reading, McGee's claim that Sullivan

denied "repeated" requests for use of a more private bathroom, one that would not expose

them to "female security and non-security staff and civilian passersby," the Court should

find that McGee has alleged sufficient facts to support a plausible claim.  (*Id.* at ¶¶ 409-

10.)  McGee is not alleging a one-time or infrequent event.  Rather, he is claiming that he

and other inmates were denied privacy several times a day, over the course of several

days, without reasonable justification.  Such "regular" conduct by DOC personnel states a

plausible privacy claim. *See, e.g., Cumbey*, 684 F.2d at 714. Defendants' motion to dismiss for failure to state a viable claim should therefore be DENIED.

With respect to personal involvement by supervisors, Defendants assert that the claims against Defendants Rutherford, McWard, Kupec, Pallito and Carbonell are each lacking. As to Defendants Rutherford and McWard, McGee explains in his opposition memorandum that these Defendants provided specific responses to his grievances, with Rutherford in particular providing an explanation of the reasoning behind the decision. (Doc. 71 at 121-22.) The claims against Rutherford and McWard should thus survive the motion to dismiss.

In contrast, the claims brought against Kupec and Pallito are that they never provided any sort of response. As discussed above, that is insufficient to establish the personal involvement of a supervisor for purposes of § 1983. Finally, while McGee concedes that the Complaint makes "no specific allegations concerning Defendant Carbonell," he invites the Court to infer that from her daily rounds in the unit, she must have known that fishtank inmates using the toilet could be viewed by members of the opposite sex. (*Id.* at 124-25.) The Court should not allow such a speculative claim to proceed. *See Iqbal*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ."). I therefore recommend that Defendants Kupec, Pallito and Carbonell be DISMISSED from Count 8.

## VII.  Due Process Claim (Count 13)

Count 13 alleges that the DOC regularly deprived McGee of his personal property, including some of his legal materials. The alleged deprivations usually occurred during

McGee's transfers between prison cells and facilities.  McGee alleges that in nearly every instance, his personal property was taken without a corresponding property receipt, and on several occasions was lost.

Defendants first argue that only intentional deprivations are actionable under the Due Process Clause, and that negligence does not rise to the level of constitutional harm. Defendants also submit that "random and unauthorized" conduct by government officials requires only post-deprivation remedies.  (Doc. 59 at 38) (citing *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)); *see DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). McGee's claim, however, is that the deprivations of his personal property were so pervasive and predictable as to amount to a custom or practice by DOC officials.  Stated somewhat differently, McGee is claiming that the deprivations were both authorized and intentional, and that a post-deprivation remedy was therefore inadequate.

The extent to which Defendants' conduct was either authorized or intentional has not yet been established.  The pattern of conduct set forth in the Complaint, however, is sufficient to allege a plausible due process claim.  Moreover, the number of items allegedly lost or confiscated – including a sweatshirt, shorts, an expensive pen, pajamas, socks, storage boxes, bowls and a cribbage board – amounts to a property interest greater than those cited by Defendants as *de minimis*.  (Doc. 59 at 39-40.)

Defendants also argue, albeit briefly, that McGee has released them from liability with respect to each of his personal property claims.  McGee signed a general release on June 6, 2010, approximately five months after filing the Complaint in this case, releasing the DOC and its "officers, agents, employees . . ." from liability with regard to his

45

personal property claims.  (Doc. 59-5 at 1.)  The general release covers claims "related to my personal property from the beginning of the world to the day of the date of this release, expressly limited to any and all claims for damages, costs and/or for attorneys' fees in connection with, arising out of, or related to any of the claims asserted or that could have been asserted" in the replevin action (*McGee v. Southern States Corr. Facility*, No. 832-11-09-Wncv) and a separate action against former DOC Commissioner Steven Gold (*McGee v. Gold*, No. 108-2-06-Wncv).  *Id.*

While the general release may have waived each of the claims set forth in Count 13, the Court cannot take that document into account at this time.  *See, e.g., Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498-99 (S.D.N.Y. 2003).  The general release is before the Court as an exhibit to Defendants' motion to dismiss.  As it post-dated the Complaint, it was not mentioned in McGee's initial pleading.

In deciding a 12(b)(6) motion, the Court may not consider evidence that is outside of the pleadings.  Rather, the Court is limited to reviewing the four corners of the Complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the Court may take judicial notice.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed. R. Civ. P. 56.  *See* Fed. R. Civ. P. 12(b); *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000).

46

In this case, the Court should decline to convert Defendants' motion to a motion for summary judgment. Conversion to summary judgment would entail additional delay, not only with regard to Count 13, but as to all of the claims discussed above. I therefore recommend that rather than delaying resolution on all claims while the parties submit statements of fact regarding Count 13, the Court instead decline to consider the general release at this time. The parties may re-submit the general release for the Court's consideration, with additional briefing, when procedurally appropriate.

This brings the Court again to the question of personal involvement. Defendants argue for dismissal on this basis on behalf of Martinson, Kupec, Oddy, Potanas, Edwards, Carbonell, Pallito and Salem. The allegation against Assistant Superintendent Martinson is that McGee spoke with him on several occasions regarding NSCF staff taking property without issuing receipts, but that Martinson did not cure the problem. This allegation appears to fit squarely with the second *Colon* factor, which requires notice and a failure to offer a remedy. 58 F.3d at 873. The alleged violation was ongoing, and notice appears to have been provided not merely through a standard grievance process or other written correspondence, but in the course of personal conversations between McGee and Martinson. *Cf. Anderson v. Duke*, 2006 WL 2792735, at *5 (N.D.N.Y. Sept. 27, 2006) (explaining that cases involving letters and grievances "are premised upon the inability to say with certainty that an ignored letter . . . provides the basis to conclude that the recipient knew or reasonably should have been aware of the violation"). The Court should thus DENY the motion to dismiss Defendant Martinson.

As to Defendant Kupec, the allegation is that he was involved in McGee's state court litigation commenced in 2005.  In the course of that litigation, Kupec reportedly submitted an affidavit regarding the proper use of property inventory forms in the prison setting.  Kupec also allegedly "reiterated the need for Department staff to issue" inventory forms during a meeting of DOC facility superintendents in 2006.  (Doc. 7 at ¶¶ 596-600).

What McGee does not allege is that Kupec responded to any specific complaints or grievances.  (*Id.* at ¶¶ 616, 731, 760.)  Moreover, the allegations in the Complaint suggest that to the extent Kupec was personally involved, he made efforts to improve the handling of prisoner property.  The motion to dismiss Kupec for lack of personal involvement in constitutional violations should therefore be GRANTED.

McGee's claim against Defendant Oddy, housing unit manager at the DOC's Out-of-State Office, is that Oddy failed to ensure the development and use of accurate property lists for out-of-state transfers.  (*Id.* at ¶ 622.)  McGee also alleges that Oddy was "repeatedly sent copies of the [Kentucky facility's] allowable property list."  (*Id.* at ¶ 649.)  Although McGee claims generally that the Property Officer in Kentucky "complained about the condition of property arriving from Vermont," it is not clear from the Complaint whether such notice went to Oddy directly.  Nor is it apparent that Oddy reviewed such complaints.  This sort of vague allegation of notice is insufficient to sustain a plausible claim of personal involvement, and the claim against Defendant Oddy should be DISMISSED.

Count 13 does not assert any specific allegations of supervisory involvement by Defendant Mark Potanas, chief of security at SSCF.  (*Id.* at 38.)  The motion to dismiss Potanas from Count 13 should therefore be GRANTED.

As to Defendant James Edwards, a Correctional Officer and property officer at SSCF, Defendants argue that McGee "offers only the conclusory allegations that Edwards knew about, participated in, or failed to correct certain policies."  (Doc. 59 at 41.)  McGee's allegations, however, are more than conclusory, providing specific details about Edwards' direct involvement in the handling of prisoner property.  The Complaint alleges that Edwards called McGee to inventory his property, issued him property receipts, and told him which property needed to be sent to storage.  (Doc. 7 at ¶¶ 690-92, 697-98, 700-01.)  Edwards also made reference to "higher ups" having decided which property could be stored.  Consequently, Defendants' arguments with respect to Edwards' liability as a supervisor, and that he lacked sufficient involvement in alleged property deprivations, are misplaced.  The motion to dismiss Edwards from Count 13 should therefore be DENIED.

The claims in Count 13 being brought against Defendant Anita Carbonell, SSCF's Superintendent, are that McGee wrote her more than once regarding the treatment of his personal property.  Carbonell allegedly responded in writing, sometimes granting McGee's requests, and at other times requiring that his property be sent to storage.  (*Id.* at ¶¶ 702-06.)  This level of involvement is sufficient to state a plausible claim of supervisor liability under *Colon*.

49

Commissioner Pallito is also named in Count 13.  In 2009, Pallito allegedly responded to McGee's grievance regarding property receipts, stating that an investigation had revealed that "'inmates who arrive awaiting out of state transfer are routinely not provided with property receipts while at SSCF.'"  (*Id.* at ¶ 654.)  Pallito was therefore aware of the alleged problem, and personally responded in a way that may subject him to liability if the underlying policy was unconstitutional.  *See, e.g., Charles*, 2009 WL 890548, at *6.

Finally, Defendants move to dismiss the claims in Count 13 being brought against Defendant Salem.  As in Count 12, the claim is that Salem failed to implement corrective policies.  Unlike Count 12, McGee is seeking damages against Salem for her alleged actions.  Notably absent in Count 13 are any allegations that Defendant Salem had notice of the alleged violations.  (Doc. 7 at ¶¶ 761-63.)  The claims against Defendant Salem should therefore be DISMISSED.

## VIII.  Qualified Immunity

Defendants further argue that, with respect to McGee's constitutional claims, they are entitled to qualified immunity.  This argument is premature.

Government officials performing discretionary functions are entitled to qualified immunity "from federal constitutional claims . . . as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  "Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage."

50

*Charles v. New York State DOCS*, 2009 WL 890548, at *10 (N.D.N.Y. Mar. 31, 2009)

(citing *McKenna v. Wright*, 386 F.3d 432, 436–37 (2d Cir. 2004)).  "The defense must be

based on facts appearing on the face of the complaint."  *Id.* at * 10 (citing *Benzman v.

Whitman*, 523 F.3d 119, 125 (2d Cir. 2008); *see also Bernstein v. City of New York*, 2007

WL 1573910, at *9 (S.D.N.Y. May 24, 2007) ("[b]ecause the qualified immunity defense

necessarily involves a fact-specific inquiry, '[i]t is generally premature to address the

defense of qualified immunity in a motion to dismiss pursuant to [Rule] 12(b)(6)' ")

(quoting *Walker v. Mendoza*, No. 00 Civ. 93, 2000 WL 915070, at *7 (E.D.N.Y. June 27,

2000)).

  In this case, Defendants argue qualified immunity as a general matter, relying

primarily on their previous arguments for dismissal.  With little further analysis, the

Court should not conclude that Defendants are entitled to qualified immunity based solely

on the allegations set forth in the Complaint.  "Depending on what evidence is adduced

through discovery, dismissal of plaintiff's claims against [the Defendants] may be

warranted on a properly supported motion for summary judgment, but at this point,

dismissal on this basis as to [the Defendants] is premature."  *See Rivera v. Fischer*, 655 F.

Supp. 2d 235, 239-40 (W.D.N.Y. 2009).  I therefore recommend that the Court decline to

dismiss any claims on the basis of qualified immunity at this time.

## IX. Sovereign Immunity

  Defendants also contend that DOC Commissioner Pallito is entitled to sovereign

immunity with respect the claims brought against him in Counts 5 through 13.  The

Eleventh Amendment prohibits suits for damages brought in federal court against

unconsenting states or state officials sued in their official capacities. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974). As the Supreme Court has explained, "an official-capacity suit against a state officer 'is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself." *Hafer v. Melo*, 502 U.S. 21, 26 (1991) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). Additionally, Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Relevant to this case, Congress has not abrogated Vermont's sovereign immunity from a § 1983 suit in federal court. *See Will*, 491 U.S. at 67. Moreover, the State of Vermont has expressly preserved its sovereign immunity under the Eleventh Amendment. *See, e.g.*, 12 V.S.A. § 5601(g). McGee's claims for damages against Commissioner Pallito in his official capacities are therefore barred by the Eleventh Amendment, and should be DISMISSED.

## X.     State Law Claims

In addition to federal constitutional claims, each Count of the Complaint sets forth a state statutory or constitutional claim. Defendants argue for dismissal of these state law claims on the ground that the cited provisions "have not been recognized as supporting private causes of action, are plainly inapplicable to the claims in his Complaint, or both." (Doc. 59 at 41.) McGee's opposition memorandum does not respond to this portion of

the motion to dismiss.  The Court must nonetheless review the Defendants' arguments to determine if dismissal of the state law claims is warranted.  *See McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000).

In the first twelve Counts, McGee cites various Articles within Chapter I of the Vermont Constitution.  These citations include references to Chapter I, Article 4, which the Vermont Supreme Court has determined "does not 'create substantive rights.'" *Mellin v. Flood Brook Union Sch. Dist.*, 790 A.2d 408, 422 (Vt. 2001) (quoting *Shields v. Gerhart*, 658 A.2d 924, 927 (Vt. 1995)).  With respect to McGee's other citations within Chapter 1, specifically Articles 11, 18 and 20, there is no Vermont case law supporting a private right of action under those provisions.  *See generally Shields*, 658 A.2d at 930-34. The same is true of McGee's statutory citations to 28 V.S.A. §§ 601, 801 and 853.  *Cf. Borden v. Hofmann*, 974 A.2d 1249, 1252-56 (Vt. 2009) (analyzing alleged § 851 violation under federal substantive due process standards).

Defendants further argue that McGee's claim under Chapter I, Article 10 is misplaced.  That constitutional provision bars the State from depriving a person of his liberty without due process of law, and pertains to "prosecutions for criminal offenses . . . ."  *See* Vt. Const. Ch. I, Art. 10; *see Parker v. Gorczyk*, 744 A.2d 410, 416 (Vt. 1999). As this case does not involve a criminal prosecution, Article 10 has no application here. Similarly, Article 2 of Chapter I pertains to governmental takings, and thus requires compensation for "property taken for the use of the public."  Vt. Const. Ch. I, Art. 2. Article 2 does not apply to the loss or confiscation of a prisoner's personal property, particularly when there is no allegation the property was taken for "use of the public."

*See, e.g., Allen v. Wood*, 970 F. Supp. 824, 831 (E.D. Wash. 1997) (no takings claim where inmate failed to show "that property he was authorized to receive was taken for public use").

McGee's final state law citation is to 28 V.S.A. § 708.  That statute pertains to an inmate's discharge from confinement, with subsection (b) requiring the return of an inmate's personal possessions.  28 V.S.A. § 708(c).  McGee is currently incarcerated, and was incarcerated during all of the events alleged in the Complaint.  Section 708 of Title 28 thus does not apply to this case.

For each of these reasons, I recommend that McGee's state law claims be DISMISSED.

## XI.    McGee's Motion to Amend Complaint

To the extent that the Court is dismissing any claims, McGee has moved for leave to amend his Complaint to cure any deficiencies.  I find that this motion is premature, and that it does not comply with the Local Rules.  Local Rule 15 requires a redlined version of a proposed amendment "clearly designating additions and deletions."  L.R. 15(a). While the Court acknowledges that red-lining may be difficult for a prison inmate to execute, at the very least the Court must know what amendments are planned before granting leave to amend.  This is particularly true with a Complaint of the size presented in this case.  The motion to amend (Doc. 82) is therefore DENIED without prejudice to re-filing.

## Conclusion

For the reasons set forth above, I recommend that Defendants' motion to dismiss (Doc. 58) be GRANTED in part and DENIED in part. Specifically, I recommend that Counts 1, 2, 4, 6, 7, and 9 be DISMISSED in their entirety. I recommend that Count 3 be DISMISSED except with regard to McGee's claims of inadequate winter clothing, and the claims related to his sweatpants. Also, Defendant Martinson should be DISMISSED from Count 3 for lack of personal involvement.

In Count 5, Defendant Salem should be DISMISSED insofar as McGee is seeking damages. In Count 12, Defendants Carbonell, Kamel, Kupec, Pallito and Salem should each be DISMISSED, again to the extent that McGee is seeking damages. In Count 8, Defendants Kupec, Pallito and Carbonell should be DISMISSED from McGee's claims for damages. And in Count 13, Defendants Kupec, Oddy, Potanas and Salem should be dismissed from any claims for damages. All state law claims should be DISMISSED. Defendants' motion to dismiss should otherwise be DENIED.

The motion to dismiss submitted by Defendant Prison Health Services (Doc. 62), which pertains only to Count 11 and adopts the State Defendants' arguments, should be DENIED.

McGee's motion for leave to amend (Doc. 82) is DENIED without prejudice to re-filing, and his motion to order Defendants to send him copies of all documents submitted to the Court (Doc. 79) is also DENIED. The Court does, however, expect Defendants to comply with their service obligations under the Federal Rules of Civil Procedure.

Dated at Burlington, in the District of Vermont, this 3rd day of August, 2011.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).