UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

David McGee,

        Plaintiff,

        v.                          Civil Action No. 1:10-cv-11

Andrew Pallito, Robert Hofmann,
Kurt Kuehl, Robert McDougall,
Marie Salem, Robert Kupec, Kevin
Oddy, Phil Fitzpatrick, Brian Reed,
Cindy Modiano, Mary Ellen Cross,
Richard Byrne, David Talcott, Greg
Hale, Tim Harrington, Philip Brochu,
Phillip Quijano, Joseph Sylvestri,
Marshall Rich, David Martinson,
Michael Bellizzi, Scott Morley,
Anita Carbonell, Ellen McWard,
Dominic Domato, Mark Potanas,
Christina Granger, James Kamel,
Joshua Rutherford, Michael Arace,
James Edwards, Monique Sullivan,
Michael Simonds, Correctional Officer
Camp, Delores Burroughs-Biron,
Nurse Manager Doe, Nurse(s) Doe,
And Prison Health Services, Inc.,

        Defendants.

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 154, 155)

Plaintiff David McGee, a Vermont inmate proceeding *pro se* under 42 U.S.C. §

1983 and various provisions of state law, claims that Defendants violated his

constitutional rights in numerous respects during the course of his incarceration.

Specifically, his 116-page Complaint details thirteen distinct causes of action, ranging

from repeated retaliatory transfers to a denial of basic sanitation services.  Defendants are thirty-five past and present employees of the State of Vermont ("State Defendants"), Prison Health Services, Inc. ("Prison Health"), and two unidentified nurses ("Nurse Does").  Presently pending before the Court is a Motion to Dismiss filed by State Defendants pursuant to Fed. R. Civ. P. 37 (Doc. 155), and a Motion for Summary Judgment filed by Prison Health pursuant to Fed. R. Civ. P. 56 (Doc. 154).

For the reasons that follow, I recommend that both Motions be DENIED.

## Factual and Procedural Background

At the time of the events described in the Complaint, Plaintiff David McGee was an inmate committed to the custody and control of the Vermont Department of Corrections ("DOC").[1]  Although McGee brings thirteen causes of action, detailed in a voluminous, 846-paragraph Complaint (Doc. 7), the full facts underlying these causes of action need not be recounted for the purposes of deciding the two pending Motions.  For one, certain of the causes of action—Counts 1, 2, 4, 9, and 10—have previously been dismissed.  Also, the Motion to Dismiss (Doc. 155) is premised upon McGee's failure to adhere to this Court's discovery order, while the Motion for Summary Judgment (Doc. 154) relates to only one of the thirteen causes of action at issue, Count 11.  Nonetheless, for the sake of coherence and completeness, what follows is a summary of McGee's thirteen causes of action, followed by a recitation of the procedural history of the case.

---

[1]  McGee appears to have since been released from incarceration.  (Doc. 125.)

**I.      Claims Related to Conditions of Confinement (Counts 1, 3, 4, 7, and 9)**

Five of McGee's claims relate to the conditions of his confinement.

In Count 1, McGee claims that while incarcerated in Vermont's Northwest State Correctional Facility he was barred from using the bathroom facilities at will.  (Doc. 7 at ¶¶ 53-128, 768-70, 796-98.)  During the facility's "third shift"—between the hours of 10 p.m. and 6 a.m.—two shift officers enforced a "two[-]hour rule": inmates were only permitted to use the restroom once every two hours.  "No matter how much inmates begged and pleaded to use the restroom, [the officers] would not let them out of their cell if they had used the restroom within the previous two hours."  (*Id*. at ¶¶ 62-63.)  McGee and other inmates "often had no choice but to urinate into containers in their cells, such as soda bottles, jugs, or cups."  (*Id*. at ¶ 67.)  The two officers would not permit them to empty these containers, resulting in "open containers of urine and feces sitting around in cells."  (*Id*. at ¶ 71.)  The Complaint recounts one episode in which adherence to the "two[-]hour rule", as well as one of the officer's refusal to answer McGee's repeated pleas for help, resulted in him beginning to "urinate uncontrollably" into a coffee mug in his cell.  (*Id*. at ¶¶ 74-103.)  McGee was subsequently diagnosed with an enlarged prostate, a condition that causes a frequent and urgent need to urinate.  (*Id*. at ¶ 105.)  Relatedly, McGee also claims that inmates were denied water in the evening (so as to limit their corresponding need to urinate) and, even when permitted to use the restroom, were not allowed to wash their hands with soap.  (*Id*. at ¶¶ 73, 96.)

In Count 3, McGee alleges that, while incarcerated in Vermont correctional facilities, he was denied clean, seasonally-appropriate clothing.  (Doc. 7 at ¶¶ 188-252,

773-74, 802-05.)  By McGee's description, the layout of these facilities required him to walk outside several times each day to reach the cafeteria, medical, education, and recreation buildings.  (*Id*. at ¶ 209.)  During the winter months, given McGee's lack of warm clothing, these outdoor trips would cause McGee's "body, especially his hands, toes, and ears [to] bec[o]me numb and severely painful, and he would shiver uncontrollably for lengthy periods of time even after returning inside."  (*Id*. at ¶ 210.) Around this time, McGee began to suffer from "flu-like symptoms," which he attributes to this lack of appropriate clothing.  (*Id*. at ¶ 217.)  McGee further alleges that, after his transfer to the Chittenden Regional Correctional Facility ("CRCF"), DOC officials would not allow him to keep the string that held up his sweatpants, giving him an ultimatum: "Either they could cut the string out of his sweatpants (effectively destroying them) or [McGee] would have to stay in the segregation cell naked."  (*Id*. at ¶ 246.)

In Count 4, McGee claims that during his confinement at the Northern State Correctional Facility ("NSCF") he was denied water and the use of a flushable toilet during a twenty-four hour "lockdown drill."  (Doc. 7 at ¶¶ 253-304, 775-77, 806-09.) Over the course of the day, inmates were locked in their cells and the water to all cells was turned off.  (*Id*. at ¶ 255.)  The inmates were served three meals in their cells and given one eight-ounce cup of milk with breakfast, and eight-ounce cups of Kool-Aid with both lunch and dinner.  (*Id*. at ¶ 256.)  After repeated requests, McGee also received a small "Dixie cup" of water in the afternoon.  (*Id*. at ¶ 258.)  At the time of the lockdown drill, McGee suffered from an intestinal condition that required him to "stay well-hydrated at all times."  (*Id*. at ¶ 261.)  The dehydration caused by the drill, combined with

4

this intestinal condition, resulted in McGee becoming constipated and later suffering from severe pain and bleeding during bowel movements.  (*Id.* at ¶ 262.)  McGee also claims that his inability to flush his toilet caused "noxious odors [that made] him nauseatingly sick, and the exposed raw human excrement constituted a biohazard."  (*Id.* at ¶ 267.)  By the end of the day, McGee and his cell mate "were regularly retching and dry heaving," and the odors had "made it impossible to consume food without vomiting." (*Id.* at ¶¶ 275-76.)

In Count 7, McGee complains about the conditions of confinement at the Southern State Correctional Facility ("SSCF"), claiming that over a discontinuous period of nine days from 2007 to 2009 he was held in a "fishtank" holding cell of insufficient size for the number of inmates housed there.  (Doc. 7 at ¶¶ 373-402, 782-83, 816-19.)  McGee alleges that he was "packed in like a sardine with 5 to 6 other inmates," forced to sleep on dirty mattresses directly on the floor, and was allowed only one set of clothes and access to hygiene products only once per day.  (*Id.* at ¶¶ 374, 375, 379.)  The proximity of McGee's mattress to the only toilet in the cell resulted in his getting "splashed" while other inmates used the facilities.  (*Id.* at ¶ 381.)  Because of the cramped quarters, McGee's "muscles and back became painfully sore, and his arms constantly became numb from decreased circulation."  (*Id.* at ¶ 389.)  The conditions also exacerbated his preexisting environmental dust allergies, "causing itching, sneezing, wheezing, excess mucus in [McGee]'s eyes and nose, and severe headaches."  (*Id.* at ¶ 390.)  McGee raises other allegations related to overcrowding, including his having to live in an administrative-segregation unit because of a lack of space in the general population (*id.* at

¶ 392), as well as having to be the "third inmate in a cell with only two bunks that was designed to hold only two persons" (*id.* at ¶ 394). McGee additionally claims that his possessions were frequently covered with ants due to "regular" infestations in the ground floor cells. (*Id.* at ¶ 397.)

In Count 9, McGee alleges that, for a period of seven days in administrative segregation at SSCF, he was denied use of a proper, well-functioning toothbrush. (Doc. 7 at ¶¶ 417-36, 786-87, 823-25.) Instead, he was provided a "small, plastic 'thimble-like' tool" with a "brush" consisting of "hard, inflexible plastic toothpick like protrusions" with which to brush his teeth. (*Id.* at ¶¶ 419, 422.) McGee claims that this brush was unsanitary because it forced him "to put his fingers deep into his mouth," thereby also creating a possibility of choking and causing him to "gag repeatedly." (*Id.* at ¶¶ 420-21.) The sharp forward edge of the tool also caused McGee to gouge his cheeks "causing lacerations, severe pain, bleeding, and lasting sores." (*Id.* at ¶ 423.) The tool was also ineffective for its intended purpose, brushing, thus causing a buildup of plaque on his teeth that increased their sensitivity. (*Id.* at ¶ 426.) McGee notes the particular unfairness of his being forced to use the non-functioning toothbrush because he was placed in segregation only for reasons related to overcrowding in the general population and not because he posed a security risk or deserved punishment. (*Id.* at ¶¶ 428-31.)

## II.   Retaliatory Transfer Claims (Counts 2, 5, 6, and 12)

Four of McGee's claims relate to repeated retaliatory transfers to, between, and from different Vermont correctional facilities.

In Count 2, McGee claims that in January 2007 he was transferred from a Kentucky facility to a Vermont facility in retaliation for his filing of civil suits in Vermont state court against DOC staff.  (Doc. 7 at ¶¶ 129-87, 771-72, 799-801.)  At the time that attorneys for the State of Vermont noticed their intended depositions of McGee at CRCF, he had been housed in a Kentucky facility for two years, "had acquired a great deal of personal property not allowed in Vermont prisons, had a prison job, and lived in an 'honor dorm.'"  (*Id*. at ¶ 134.)  McGee filed an objection in Vermont state court against his transfer, but the transfer was completed before the court could issue its ruling.  (*Id*. at ¶ 144.)  To effect the transfer, McGee had to endure "a 23-hour transport from Kentucky to Vermont in full mechanical restraints"; when he arrived at SSCF he "was kept in a windowless, constantly-illuminated torture-chamber holding tank for 2 ½ days."  (*Id*. at ¶¶ 146-47.)  Over the course of nine days, McGee was repeatedly transferred between Vermont correctional facilities, often under "harsh conditions" and with fewer privileges than he had enjoyed in Kentucky, all "as pretext for the true purpose of retaliation for filing a lawsuit and to deliberately disrupt his ability to litigate."  (*Id*. at ¶¶ 182-83.)  McGee also alleges that the transfer deprived him of certain of his legal materials necessary for maintenance of his lawsuits, causing him to miss a motions deadline and rendering him unable to prepare for his deposition.  (*Id*. at ¶¶ 164-68, 172.)

In Count 5, McGee claims another retaliatory transfer from Kentucky to Vermont in April 2009 for his filing of civil litigation in Vermont state court.  (Doc. 7 at ¶¶ 305-56, 778-79, 810-12.)  Although jury selection had previously been scheduled, it was "effectively canceled" after the parties submitted cross-motions for summary judgment.

(*Id*. at ¶ 313.)  Despite the cancellation (an entire month prior), attorneys for the State of Vermont requested McGee's transfer to Vermont for jury selection.  (*Id*. at ¶ 311.)  The transfer process again caused McGee intense pain, and, once in Vermont, he was housed under conditions considerably harsher than in Kentucky.  (*Id*. at ¶¶ 325-38, 345-47.)  The transfer, along with instances of "deliberate[] destr[uction]", also curtailed McGee's access to his legal materials, limiting his ability to oppose the DOC's motion for summary judgment.  (*Id*. at ¶¶ 341, 348.)  When he asked why he had been transferred to Vermont to attend a hearing that had been cancelled, he was allegedly told that the DOC was "just yanking [his] chain."  (*Id*. at ¶ 349.)  Overall, McGee endured "3 transfers in 17 days" to and between Vermont facilities as retaliation for "his constitutionally protected activity of filing a lawsuit."  (*Id*. at ¶ 351.)

In Count 6, McGee alleges that, after his April 2009 transfer from Kentucky to Vermont (for the cancelled jury draw), he was further transferred from CRCF to SSCF as retaliation for his filing of a series of grievances relating to conditions at CRCF.  (Doc. 7 at ¶¶ 357-72, 780-81, 813-15.)  Although a CRCF official informed McGee that his grievances had raised "valid issues," the facility superintendent's "only response was to ask how soon [McGee] could be transferred to another facility."  (*Id*. at ¶¶ 360-61.)  Upon arrival at SSCF, overcrowding in the general population forced McGee to sleep in the "fishtank" unit for over three days, and, thereafter, in segregation "undue punitive conditions" for eight days.  (*Id*. at ¶ 366.)  While in segregation, McGee was denied all personal property and only allowed to leave his cell for one hour per day.  (*Id*. at ¶ 368.)

In Count 12, McGee claims that, during his transfer from SSCF back to Kentucky in July 2009 (after the earlier retaliatory transfer to Vermont), certain of his legal documents were intentionally mishandled and destroyed.  (Doc. 7 at ¶¶ 506-70, 792-93, 832-34.)  When his property from Vermont arrived in Kentucky, McGee "immediately discovered that a large portion of those legal files that had been neatly organized in storage at SSCF appeared just to have been 'dumped' into other boxes, as everything was in complete disarray: documents had fallen out of their respective folders and become crumpled and all mixed together."  (*Id*. at ¶ 548.)  In addition, McGee's "expensive legal reference books were warped, ripped, and the covers bent."  (*Id*.)  Certain specific folders of legal documents were also missing.  (*Id*. at ¶ 550.)  McGee claims that "these specific documents were taken because they directly pertained to a lawsuit about SSCF personnel mishandling inmate personal property."  (*Id*. at ¶ 551.)

## III.   Privacy Claim (Count 8)

In Count 8, McGee alleges that, while housed in the "fishtank" unit at SSCF, he was forced to use a toilet that could be seen by female correctional officers.  (Doc. 7 at ¶¶ 403-16, 784-85, 820-22.)  According to McGee, both male and female security officers can see inmates using the toilet in the "fishtank" because it is viewable through the unit door and window, as well as by video camera.  (*Id*. at ¶¶ 406-07.)  Although there is a private restroom available in the unit, and McGee (and others) repeatedly requested to use that facility, there is an informal "rule"—"arbitrarily applied without any consistent triggering criteria"—that inmates living in that unit must use the toilet that is in public view.  (*Id*. at ¶¶ 408-10, 413.)  One of the correctional officers, in denying the requests to

use the private restroom, "sat at her desk doing nothing but laughing and ogling at" the inmates.  (*Id*. at ¶ 411.)  In McGee's view, there was "no reasonably legitimate penological justification for denying [his] access to the private" toilet (*id*. at ¶ 414), and forcing him to use the public toilet denied him his "already limited expectation of bodily privacy" (*id*. at ¶ 785).

## IV.    Access to Courts Claim (Count 10)

In Count 10, McGee claims that, as it related to a case he filed against the DOC in 2006, corrections officials unlawfully restricted his access to legal materials necessary to maintenance of his case.  (Doc. 7 at ¶¶ 437-84, 788-89, 826-28.)  McGee experienced protracted delays in his requests for case law, as well as limitations in his access to the prison law library.  (*Id*. at ¶¶ 442-48.)  His subsequent transfers to Vermont DOC facilities exacerbated these problems, as he was not permitted to bring his legal materials with him via transport from Kentucky, instead having to "wait for them to be sent separately via UPS" which took "several weeks to over a month" to reach him.  (*Id*. at ¶¶ 452-53.)  DOC officials also repeatedly ignored McGee's requests to retrieve his legal materials from storage.  (*Id*. at ¶¶ 460-69.)  McGee claims that these steps, taken together, caused him severe prejudice, as they hindered his ability to file a response to a motion for summary judgment with regard to his "non-frivolous legal claim."  (*Id*. at ¶ 478.)[2]

---

[2]  Count 10 has been dismissed by stipulation of the parties.  (Doc. 68.)

## V.      Medical Care Claim (Count 11)

In Count 11, McGee alleges that he was systematically denied medications for a variety of medical conditions while in DOC custody.  (Doc. 7 at ¶¶ 485-505, 790-91, 829-31.)  McGee suffers from a number of physical ailments: environmental allergies, back and knee pain, intestinal pain and bleeding, and migraine headaches.  (*Id*. at ¶ 488.) McGee also suffers from certain mental health conditions, including depression and bipolar and anxiety disorders.  (*Id*.)  When he arrived at SSCF, McGee had already been prescribed a range of medications for these conditions.  (*Id*. at ¶ 487.)  Despite having these prescriptions, "[d]uring [his] time at SSCF, several of these chronic medications were allowed to expire without automatic renewal, or were wrongfully discontinued." (*Id*. at ¶ 489.)  As a result, McGee had "to go without the medications for, at times, over a week."  (*Id*.)  During these lapses in treatment, McGee "suffered pain and degeneration of his medical and mental health conditions, which interfered with his daily activities." (*Id*. at ¶ 491.)  McGee alleges that Nurse Does and Prison Health maintained a custom of failing to renew prescriptions for chronic conditions before they expired—instead allowing inmates to submit medical requests for renewal only after expiration—and even permitting non-prescribers to discontinue medications without warning before they expired.  (*Id*. at ¶¶ 492-93.)[3]  This practice, a nurse allegedly told McGee, was followed so as to "save money."  (*Id*. at ¶ 496.)

---

[3]  According to the Complaint, Nurse Does justified this practice by noting that discontinuation was automatic if an inmate missed "several doses" of the medication in question.  (Doc. 7 at ¶ 494.) "However, inmates, including [McGee], were given no advance warning of this policy and [McGee]'s requests to see this policy in writing were denied."  (*Id*.)  Also, McGee notes that some of these medications were to be taken only on an "as needed" basis, and should not have been discontinued for his failure to take them continuously.  (*Id*. at 502.)

## VI.    Due Process Claim (Count 13)

Finally, in Count 13 (which alone makes up the bulk of the Complaint), McGee claims that DOC officials repeatedly denied him his personal property without due process.  (Doc. 7 at ¶¶ 571-766, 794-95, 835-40.)  Subsumed within this count are a number of alleged failings by DOC officials regarding treatment of McGee's own personal property, as well as institutional deficiencies—by "customs, systemic practices, and inadequate protective procedures" (*id*. at ¶¶ 759, 641, 655, 670, 749, 765)—in the handling of inmate property generally.  McGee summarizes this claim as follows, alleging that various DOC officials should be held liable for:

> (1) allowing any staff unfettered discretion in taking inmate personal property; (2) failing to provide inmates with receipts or notice when taking possession of or confiscating inmates' property; (3) using incorrect lists of allowed property when transferring inmates between correctional facilities, resulting in sending facilities predictably dispossessing inmates of personal property allowed at the destination facilities; (4) sending inmate personal property to third-parties without the inmate-owner's authorization; (5) failing to hold due[-]process hearings after confiscating inmate property and before permanently dispossessing the inmate-owner of the property; (6) failing to inform the inmate-owner of, and failing to document, the "final disposition" of inmate property before destroying or disposing of it; (7) unreasonably delaying inmates' receipt of their personal property during transfers between correctional facilities; (8) unreasonably withholding and delaying the transfer of inmates' allowable personal property without legitimate penological justification; (9) dispossessing those inmates who are temporarily returned to Vermont from [out-of-state] facilities for legal proceedings of their [out-of-state] allowable property; and (10) general and widespread mishandling of and disregard for inmate personal property that results in manifestly predictable losses, withholding, and damage.

(*Id*. at ¶ 764.)

## VII.   Procedural History

McGee filed his Complaint on January 20, 2010, asserting a range of federal constitutional claims pursuant to 42 U.S.C. § 1983, as well as state law claims over which he asked the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367.  (Doc. 7.)  In his Complaint, McGee identified State Defendants—thirty-five past and present employees of the State of Vermont—and brought suit against certain of these individuals in each of his thirteen causes of action.  Other than DOC Commissioner Andrew Pallito (who was sued in both his individual and official capacities), McGee filed suit against each State Defendant and Nurse Does only in their individual capacities.  (Doc. 7 at ¶¶ 9-46.)  Only Count 11, related to the systematic denial of medication, was brought against Prison Health and Nurse Does.  (*Id*. at ¶ 791.)  McGee sought injunctive relief as to some claims, and declaratory and monetary relief on every claim.  (*Id*. at ¶¶ 796-846.)

In response, State Defendants (Doc. 58) and Prison Health (Doc. 62) moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[4]  State Defendants argued that McGee's various claims should be dismissed on their merits, for lack of personal involvement of certain Defendants, and by application of both qualified and sovereign immunity.  (Doc. 58.)  In its motion, Prison Health adopted the State Defendants' arguments as relevant to Count 11.  (Doc. 62.)  Soon after the filing of the Motions to Dismiss, the parties stipulated to the dismissal of Count 10, with prejudice.  (Doc. 68.)

---

[4]  Due to a typographical error, State Defendant Michael Simonds (who was misidentified in the Complaint as "Simons" (Doc. 7 at 6)) filed a separate Motion to Dismiss, arguing that the claims against him should be dismissed for McGee's failure to effect timely service of process.  (Doc. 94.)  I recommended that the Motion to Dismiss (Doc. 100) be denied, which the district court adopted (Doc. 119).

In a Report and Recommendation dated August 3, 2011, I recommended that the State Defendants' Motion to Dismiss be granted in part and denied in part, and Prison Health's Motion to Dismiss be denied.  (Doc. 84.)  Specifically, I recommended that Counts 1, 2, 4, 6, 7, and 9 be dismissed in their entirety.  (*Id*. at 14, 25, 28, 29, 35, 39.)  As to the remaining counts, I recommended the dismissal of certain individual State Defendants for lack of personal involvement.  (*Id*. at 55.)  Finally, I further recommended that claims for money damages against Commissioner Pallito in his official capacity be dismissed by application of sovereign immunity and that all of McGee's state law claims be dismissed because none of the cited provisions supported private causes of action.  (*Id*. at 51-54.)

The District Court adopted the Report and Recommendation in full.  (Doc. 97.)  After McGee moved for reconsideration (Doc. 101), however, the District Court reinstated Counts 6 and 7 (Doc. 118).  As such, eight of McGee's original thirteen causes of action have survived dismissal to date.  On May 6, 2013, the Court granted State Defendants' Motion to Compel McGee's production of certain discovery on or before May 31, 2013.  (Doc. 152.)  Pursuant to the most recent discovery schedule, discovery was to be completed by July 1, 2013, with summary judgment motions due, and the case ready for trial, on August 30, 2013.  (Doc. 153.)

## Discussion

As stated, presently pending before the Court is a Motion to Dismiss filed by State Defendants pursuant to Fed. R. Civ. P. 37 (Doc. 155), and a Motion for Summary Judgment filed by Prison Health pursuant to Fed. R. Civ. P. 56 (Doc. 154).

14

**I.      State Defendants' Motion to Dismiss**

State Defendants moved to dismiss all remaining claims pursuant to Fed. R. Civ.

P. 37, claiming that McGee "willfully violated" this Court's discovery order by his

refusal to respond to repeated requests for discovery and his failure to meet the July 1st

discovery deadline.  (Doc. 155 at 1-2.)  Thus far, State Defendants have received no

discovery from McGee, "thereby depriving State Defendants of the ability to adequately

prepare a defense to his claims" (*id*. at 2) and prejudicing their defense "as memories fade

and key witnesses and employees change jobs or leave the [s]tate" (*id*. at 6).  Since

October 2012, State Defendants have served McGee with three discovery requests,

including requests to produce and interrogatories seeking documents and information

related to his remaining claims (Docs. 135, 137, 146), as well as numerous informal

requests for responses (Docs. 155-1, 155-2, 155-3, 155-4, 155-5, 155-6).  No discovery

has yet been received.  In an email exchange with an attorney for State Defendants,

McGee cited personal reasons for the delay.  (Doc. 155-6 at 2.)  After State Defendants

filed a Motion to Compel (Doc. 150), this Court ordered McGee to respond to the three

discovery requests by May 31, 2013 (Doc. 152).  That deadline has passed and discovery

has still not been forthcoming.  McGee's failure to respond is now also in violation of

this Court's revised discovery schedule, which sets a discovery deadline of July 1, 2013.

(Doc. 153.)  By the instant Motion, State Defendants ask that this Court "dismiss

Plaintiff's action with prejudice as a sanction for his repeated failure to respond to any of

the State's written discovery requests and his willful violation of the Court's . . .

Discovery Order and the Amended Discovery Schedule."  (Doc. 155 at 4-5.)

Rule 37 of the Federal Rules of Civil Procedure addresses the consequences of a party's failure to respond to discovery requests or comply with discovery orders. Under that rule, a court may order sanctions where a party, as relevant here, either fails to respond to interrogatories, Fed. R. Civ. P. 37(d)(1)(A)(ii), or fails to comply with an order to provide discovery, Fed. R. Civ. P. 37(b)(2)(A). The rule permits a range of sanctions for such violations, from "staying further proceedings until the order is obeyed" to "dismissing the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iv), (v); Fed. R. Civ. P. 37(d)(3) ("Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."); Fed. R. Civ. P. 16(f) (authorizing sanctions under Rule 37(b) for "fail[ure] to obey a scheduling or other pretrial order"); Fed. R. Civ. P. 41(b) (permitting dismissal "[i]f the plaintiff fails to prosecute or to comply with these rules or a court order"). Disciplinary sanctions serve three purposes.

> First, they ensure that a party will not benefit from its own failure to comply. Second, they are specific deterrents and seek to obtain compliance with the particular order issued. Third, they are intended to serve a general deterrent effect on the case at hand and on other litigation, provided that the party against whom they are imposed was in some sense at fault.

*Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988). Mindful of the importance of these goals, the Second Circuit recognizes that district courts are vested with "broad power" and discretion to impose sanctions under Rule 37. *Friends of Animals Inc. v. U.S. Surgical Corp.*, 131 F.3d 332, 334 (2d Cir. 1997) (per curiam).[5]

---

[5] With their Motion to Dismiss, State Defendants filed the necessary certification explaining their good faith efforts to resolve these issues without court action. (Doc. 155-1.) *See* Fed. R. Civ. P. 37(d)(1)(B); Local Rule 26(d).

16

The difficulty lies in the choice of sanction.  Dismissal with prejudice—sought here by State Defendants—"is a drastic remedy that should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions."  *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988) (citation and internal quotation omitted).  In evaluating whether to impose such a severe penalty, courts generally consider the following factors: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance."  *Agiwal v. Mid Island Mortgage Corp.*, 555 F.3d 298, 302 (2d Cir. 2009) (per curiam) (citation and internal quotation omitted).  When confronted with a *pro se* litigant, like McGee, the latter factor (a pre-dismissal warning) is not optional; it is a hard-and-fast requirement.  In recognition of the "special solicitude" reserved for *pro se* litigants, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006), dismissal may *only* be ordered "so long as a warning has been given that noncompliance can result in dismissal."  *Valentine v. Museum of Modern Art*, 29 F.3d 47, 50 (2d Cir. 1994); *see also Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir. 1990).

In McGee's case, no such warning has been given.  State Defendants admit as much, noting in their Motion to Dismiss that "the Court's Discovery Order did not expressly state that Plaintiff's case could face dismissal for his failure to obey."  (Doc. 155 at 6.)  Nevertheless, they hang their hat on a warning contained in the Court's January 2010 Order granting McGee's request for *in forma pauperis* status, which

vaguely admonished McGee that his failure to comply with certain of the Court's requirements, enumerated thereafter in the Order, "may result in the dismissal of the complaint." (Doc. 5 at 2.) Notably, that Order did *not* cite McGee's discovery obligations among those enumerated requirements, the violation of which could result in dismissal. As such, even accepting *arguendo* State Defendants' questionable premise about the efficacy of a three-year-old warning, the January 2010 Order was hardly specific enough to support dismissal against a *pro se* litigant. *See Biggs v. P & B Capital Grp.*, No. 10-CV-408S, 2012 WL 748317, at *3 (W.D.N.Y. Mar. 6, 2012) (declining to dismiss for lack of specificity of a warning where amended scheduling order stated that failure to comply could result in sanctions pursuant to Fed. R. Civ. P. 37(b)(2), but did "not explicitly warn Plaintiff of the possibility of dismissal"); *see also Langdell v. Hofmann*, No. 1:05-CV-174, 2006 WL 3813599, at *2-5 (D. Vt. Dec. 27, 2006) (concluding that similar instructions in order granting *in forma pauperis* status were insufficient to convey the notion that the failure to respond to discovery requests could lead to dismissal).

Because McGee has not been warned that his failure to comply with discovery orders or to respond to discovery requests could result in the dismissal of his case in its entirety, a predicate to Rule 37 dismissal of a *pro se* complaint, such a severe sanction is not cognizable at this time.

But the other factors certainly weigh in favor of discipline. McGee has been in violation of the Federal Rules of Civil Procedure since early November 2012, thirty days after State Defendants filed their first requests for production. (Doc. 135.) *See* Fed. R.

Civ. P. 34(b)(2)(A).  It is now mid-August 2013, a delay of over nine months.  In past

cases, far lesser delays have been deemed sufficient to support dismissal.  *See Griffith v.*

*Stewart*, No. 10 CV 6066(BMC)(LB), 2011 WL 6780903, at *2 (E.D.N.Y. Nov. 10,

2011) (Bloom, Mag. J.), *adopted*, 2011 WL 6812567 (Dec. 27, 2011) (dismissing case

under Rule 37 for failure to meet discovery obligations for three months and "fail[ing] to

abide by a Court order directing him to produce his responses" over that time period);

*Deptola v. Doe*, No. 04-CV-1379 DRH JO, 2005 WL 2483341, at *2 (E.D.N.Y. Oct. 7,

2005) (dismissing case for failure to prosecute three months after *pro se* plaintiff failed to

appear at a scheduling conference); *Wilson v. Oxford Health Plans (N.Y.), Inc.*, No. 01

CIV. 3417(MHD), 2002 WL 1770813, at *2-4 (S.D.N.Y. July 31, 2002) (dismissing for

failure to prosecute almost four months after plaintiff failed to respond to court's order).

From such a delay the Court can also assume a measure of prejudice to State Defendants,

as they have claimed in their motion.  *See, e.g.*, *Shannon v. Gen. Elec. Co.*, 186 F.3d 186,

195 (2d Cir. 1999) ("delay by one party increases the likelihood that evidence in support

of the other party's position will be lost and that discovery and trial will be made more

difficult").  More broadly, McGee's protracted procrastination impedes the efficient

administration of justice as it congests the Court's docket and is unfair to the numerous

other litigants awaiting the Court's attention.  *See United States ex rel. Drake v. Norden*

*Sys., Inc.*, 375 F.3d 248, 257 (2d Cir. 2004) (the Court must strike a "balance between

district court calendar congestion and the plaintiff's right to an opportunity to be heard");

*Chira v. Lockheed Aircraft Corp.*, 634 F.2d 664, 668 (2d Cir. 1980) ("Burgeoning filings

and crowded calendars have shorn courts of the luxury of tolerating procrastination.").

McGee's lengthy noncompliance could also be deemed willful.  "Noncompliance with discovery orders is considered wil[l]ful when the court's orders have been clear, when the party has understood them, and when the party's non[]compliance is not due to factors beyond the party's control."  *Davidson v. Dean*, 204 F.R.D. 251, 255 (S.D.N.Y. 2001) (quotation omitted).  McGee makes no claim that he did not understand the discovery orders, and his conduct over the course of this litigation, as well as his considerable experience as a *pro se* litigant, demonstrates his appreciation of the significance of court orders and deadlines.  In a letter to the attorney for State Defendants dated November 8, 2012, McGee noted that State Defendants had been deficient in responding to certain discovery and recognized that "[w]ith the expiration of yet another deadline for written discovery, it seems that we must ask the Court for another modification of the discovery schedule."  (Doc. 139-1 at 1-2.)  In jointly-filed motions, McGee has also repeatedly requested extension of discovery deadlines.  (Docs. 114, 117, 129, 134, 142.)[6]  Although McGee claimed via email to the attorney for State Defendants that his failure to meet an April 2013 deadline was for personal reasons beyond his control (Doc. 155-6 at 2), he has made no effort to contact the Court to justify his failure to abide by discovery deadlines.  That deadline has since been extended via an unequivocal court order: "Plaintiff is ORDERED to respond to the State Defendants' First Interrogatories in a manner compliant with the requirements of Fed. R. Civ. P. 33(b)(1) and the State Defendants' First, Second, and Third Requests to Produce in a manner compliant with Rule 34(b)(2) on or before 5/31/2013."  (Doc. 152.)  A "persistent

---

[6]  McGee also seems to have signaled his understanding of discovery deadlines in conversations with an attorney for State Defendants.  (Doc. 155-1.)

refusal to comply with a discovery order" is evidence of willfulness.  *Monaghan v. SZS 33 Assocs., L.P.*, 148 F.R.D. 500, 509 (S.D.N.Y. 1993).  Given his understanding of court deadlines, as well as this order's undeniable clarity, McGee's willful noncompliance speaks for itself.

Nonetheless, a lesser sanction in this case is difficult to identify.  As State Defendants admit, given McGee's *in forma pauperis* status, it would be "unjust" to impose a monetary sanction.  (Doc. 155 at 6.)  *See Haines v. Cook*, No. 1:07-CV-138, 2009 WL 2043865, at *2 (D. Vt. July 8, 2009) (noting that *in forma pauperis* status "weighs heavily against imposing" a monetary sanction).  In addition, the requested discovery relates to all of McGee's claims, so striking pleadings or limiting McGee's use of evidence would have the same effect as dismissal, as State Defendants recognize.  (*Id.*)  *See Langdell*, 2006 WL 3813599, at *5 (declining to impose lesser sanction where it "would render the same result as dismissal").

Dismissal is not an appropriate sanction at this time and an appropriate lesser sanction is not immediately apparent.  Accordingly, in the event this Report and Recommendation is adopted by the District Judge, a conference will be held by the undersigned pursuant to Fed. R. Civ. P. 16(a) within 30 days of the order adopting this Report and Recommendation.  Plaintiff McGee is ORDERED to respond to all outstanding discovery requests consistent with the requirements of Fed. R. Civ. P. 26 through 37 and the District of Vermont's Local Rules of Procedure before the date of the Rule 16 conference.  Should McGee fail to meet this deadline or attend this conference, the Court would take up the sanction issue again upon the filing of an appropriate motion.

This is McGee's action to vindicate his civil rights.  State Defendants (to their credit) have expended valuable time and resources to provide required discovery in defending against his claims, while McGee, by contrast, has been derelict in his discovery duties, largely absent from the case for many months.  The Court should not require Defendants to continue to litigate against a recalcitrant plaintiff who refuses to abide by the rules.  This case has already dragged on well over three years; it will not go on *ad infinitum*.  Further delay is both unfair to Defendants in particular and sends a troubling message to litigants in general.  Thus far, McGee's conduct in this litigation has thwarted this Court's ability to manage his case in an efficient and economical manner while diverting the Court's attention from other pending matters.  Such languid litigants, either *pro se* or represented, cannot be indulged.  Plaintiff McGee is now duly warned: Continued failure to respond to discovery requests, or abide by court orders compelling such responses, can—and likely will—result in dismissal of this action in whole or in part, as well as any of the other lesser sanctions enumerated in Fed. R. Civ. P. 37(b)(2). "[W]hile pro se litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including pro ses, have an obligation to comply with court orders.  When they flout that obligation they, like all litigants, must suffer the consequences of their actions." *McDonald v. Head Criminal Court Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988).

## II.    Prison Health's Motion for Summary Judgment

Prison Health has moved for summary judgment, arguing that McGee cannot make out his claim against it in Count 11 for systematic denial of medications because

Prison Health had no authority over mental health treatment, McGee has not offered expert testimony to establish the prevailing standard of care, he could not show damages, and he will be unable to prove that his medical treatment constituted cruel and unusual punishment under the Eighth Amendment to the United States Constitution.  (Doc. 154.)

There is no need to delve into the merits of these arguments.  Prison Health has failed to abide by Local Rule 56(e), insofar as it has (apparently) not provided McGee, a *pro se* litigant, with notice of the nature of summary judgment and the consequences of failing to respond to the motion.  Local Rule 56(e) also requires that this notice "must be filed together with the papers in support of the motion," which Prison Health has also failed to do.  Such notice is necessary before summary judgment can be granted against a *pro se* litigant.  *See Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999); *Irby v. New York City Transit Auth.*, 262 F.3d 412, 413-14 (2d Cir. 2001) (holding that "vacatur of the summary judgment is virtually automatic" unless *pro se* litigants receive notice "in an accessible manner" from either the court or opposing litigants, or manifest a "clear understanding . . . of the consequences of failing to comply with Rule 56."); *see also KeyBank USA, N.A. v. Hutchins*, No. 2:04-CV-105, 2005 WL 1389969, at *2 (D. Vt. June 9, 2005) (denying summary judgment for, among other things, failure to provide requisite notice to *pro se* litigant); Local Rule 56(e) (party seeking summary judgment "*must* serve and file" the notice (emphasis added)).  Prison Health does not cite any way in which McGee has otherwise received the necessary notice or demonstrated his understanding of the nature of summary judgment.  Despite the fact that McGee appears to have a certain amount experience as a *pro se* litigator (Doc. 7 at ¶¶ 50-51), *see McGee*

*v. Pallito*, No. 1:04-cv-335-jgm, 2011 WL 1156863 (D. Vt. Mar. 30, 2011), the absence

of any response to Prison Health's summary judgment motion attests to an unacceptable

risk that the failure to provide notice has fomented a misunderstanding of the nature of

summary judgment.  Accordingly, Prison Health may refile its summary judgment

motion after having sent McGee the proper notice under Local Rule 56(e) (and filing

proof of such notice with the papers in support of the motion), but, for now, summary

judgment should be DENIED.

### Conclusion

For the reasons stated above, I recommend that State Defendants' Motion to

Dismiss (Doc. 155) and Prison Health's Motion for Summary Judgment (Doc. 154) be

DENIED.

In the event this Report and Recommendation is adopted by the presiding district

judge, a conference will be held by the undersigned pursuant to Fed. R. Civ. P. 16(a)

within 30 days of the Order adopting this Report and Recommendation.  Plaintiff McGee

is ORDERED to respond to State Defendants' discovery requests consistent with the

requirements of Fed. R. Civ. P. 26 through 37 and the District of Vermont's Local Rules

of Procedure before the date of the Rule 16 conference.

Dated at Burlington, in the District of Vermont, this 13th day of August, 2013.


/s/ John M. Conroy _____
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).